OPINION
Howell, Judge,
delivered the opinion of the court.
The cause of action before the court for determination is common to three separate suits which were accordingly consolidated for trial.[1] Plaintiffs have brought their actions *468 under tbe War Contract Hardship Claims Act,[2] also known as the Lucas Act, for an equitable determination praying for relief from alleged losses suffered in the performance of contracts entered into by Acme with the United States. The Contracts were entered into and performed, and the alleged losses sustained, between September 16, 1940 and August 14,1945. Defendant has raised a number of contentions in support of its position that neither of the plaintiffs are entitled to recover, and has filed a counterclaim against Samuel Waxman in Cause No. 48761, for taxes assessed and unpaid in the amount of $11,194.12 (see Finding 28).
The facts underlying Acme’s claim will be stated briefly. Samuel Waxman is an elderly man who started his working career as a blacksmith. In 1917 he established himself as a manufacturer of small iron products under the name of “Acme Iron Works” in Eoxbury, Massachusetts. In 1942 he entered into an informal partnership arrangement with his three sons, Louis, Saul and Harry. In 1948 Acme Iron Works, by Samuel Waxman, entered into the first of a series of purchase order contracts and subcontracts for the United States Maritime Commission under which Acme was to fabricate oil storage and settling tanks to be installed in pairs on ships. Acme furnished materials and labor in accordance with the contract specifications. The first of the purchase orders was executed about May 1, 1948, and the last on June 29, 1945. After fabrication, the tanks were shipped on Government bills of lading to the Bethlehem-Fairchild Shipyard, Baltimore, Maryland; California Shipbuilding Company, Terminal Island, California, and Permanente Metals, Portland, Oregon.
Throughout the performance of the tank fabrication contracts, Acme encountered one misfortune after another, none of which were due to fault or negligence on Acme’s part nor, on the other hand were Acme’s troubles due to any breach of contract on the part of the Government. Difficulty of securing adequate skilled labor, rising costs of labor and materials, unanticipated repairs to completed tanks, and high interest rates on borrowed working capital resulted in *469 Acme’s costs exceeding its receipts under the contracts. From time to time Acme called the Government’s attention to its difficulties and it appears that Acme did make the required requests for extra legal relief within the meaning of the Lucas Act during the statutory period. On June 29, 1945, Acme filed with the Maritime Commission a written request for relief in the way of additional compensation on account of losses resulting from all the above causes, but no final action had been taken on such request when Acme’s contracts were terminated on August 14,1945 at the end of the war. On February 7, 1947, Acme submitted to the Maritime Commission a written claim for relief under the Lucas Act which was denied by the Commission on February 2,1948. On February 24,1948, the Commission affirmed its denial of Acme’s claim, whereupon the present petitions were timely filed in this court for determination of the amount, if any, to which Acme or its assignee, Atlantic Corporation, was equitably entitled to recover under the Lucas Act.[3]
Alleged Non-Gompliance by Acme With Requirements of Section # (a) of the Lucas Act and With Executive Order 9786, Paragraphs 805 and W2 (b) (c) (g) (i) (j) (h) (m) and (n)
Defendant contends first that plaintiffs may not recover because they have failed to show Acme’s net receipts or net costs, and consequently its net losses on all its government contracts performed during the statutory period. Defendant points out that Section 6 of the Lucas Act provides that this court shall have jurisdiction “to determine the amount, if any, to which such claimant or petitioner may be equitably entitled (not exceeding the amount which might have been allowed by the Department or Agency concerned under the terms of this Act),” and that Section 2 (a) provides that in arriving at a fair and equitable settlement of claims under the Act “the respective Departments and Agencies shall not allow any amount in excess of the amount of the net loss *470 (less the amount of any relief granted subsequent to the establishment of such loss) on all contracts and subcontracts held by a claimant under which work, supplies, or services were furnished for the Government between September 16, 1940 and August 1’4,1945, * * Paragraph 305 of Executive Order 9786 provides as follows:
No claimant shall be granted relief under the Act and these Regulations in any amount in excess of the amount of the net loss (less the amount of any relief granted subsequent to the establishment of such loss) on all contracts and subcontracts held by the claimant pursuant to which work, supplies, or services were furnished for the Government during the statutory period.
Paragraph 305 is little more than a restatement of the above quoted language of Section 2 (a) of the Lucas Act, and we can think of no basis on which its validity might be challenged.
It is defendant’s position that, assuming Acme’s claim as submitted to the Maritime Commission to be correct, Acme was unable to account for its receipts and costs on contracts it had with the Government prior to 1943, and therefore Acme has failed to prove its net loss on all government contracts during the statutory period.
It appears (Finding 18), that subsequent to the filing of Acme’s Lucas Act claim with the Maritime Commission on February 2,1947, the Commission sent one of its accountants to make an audit of the claim. The accountant discovered that Acme’s books and records were grossly incomplete and had been kept in such an inaccurate manner that it was impossible to use them for the purpose of determining Acme’s costs of performing the contracts. When Acme first began manufacturing tanks for the Maritime Commission, it discovered that its bookkeeper was making erroneous entries in the books, and the girl was discharged. Another girl was employed but it appears that she had little more knowledge of proper bookkeeping methods than her predecessor. A fire on the premises had destroyed some of Acme’s records; some were scattered and destroyed by a burglar and by vandals, and some were damaged and rendered illegible by rain which entered the building through a leaky flashing around a window near the point where the records were *471 stored. Upon discovering the condition of Acme’s records, the Maritime Commission’s auditor reported to his superiors that while there was no indication of any attempt to perpetrate fraud by improper bookkeeping, Acme’s records were inaccurate and incomplete. The auditor then proceeded to develop the costs applicable to the Maritime Commission contracts on a functional cost basis, allowing only such costs as were evidenced by job cost cards, tax reports, and accounts payable invoices. He and the Waxmans made extensive efforts to obtain copies of invoices from vendors who had supplied material or services to Acme, and with a few exceptions, duplicate copies were secured. He allocated the costs applicable to the Maritime Commission contracts separately from those applicable to other work and reported the costs, which he found to be supported by original records or other reliable data. He also reported the costs he found to be unsupported, consisting of additional costs claimed by the Waxmans. With respect to the Maritime Commission contracts, the auditor was unable, from the available records, to break down Acme’s costs into separate costs for each purchase order. Under the heading of supported costs, the auditor reported that in the performance of the Maritime Commission contracts, Acme had incurred a total cost of $258,681.29, and under the heading of unsupported costs, he included a total of $130,425.16. The Commissioner of this Court found (Finding 18) that the Maritime Commission’s auditor understated Acme’s costs in several respects because he did not find adequate records to support expenses claimed by the partners. Our examination of the evidence compels our complete concurrence in that finding.
With respect to defendant’s contention respecting Acme’s contracts with departments and agencies of the Government other than the Maritime Commission, the Commissioner found (Finding 6) that in addition to the Maritime contracts, Acme had contracts aggregating $4,025 with other Government agencies during the period between May 1, 1943 and August 14, 1945, as well as some private contracts. This finding was based upon paragraph 7 of the Commissioner’s Pre-trial Memorandum, and represented a statement of facts to which both defendant and plaintiffs agreed. *472 In its proposed findings of fact filed pursuant to the rules of this court, defendant proposed no finding respecting other government contracts of Acme during the statutory period. However, in its exceptions to the Commissioner’s findings, defendant for the first time requested a finding that between September 16, 1940 and August 14, 1945, Acme had “other contracts with the Department of the Army and possibly with other Government Agencies.” Although, under Rule 45 (b), we might refuse to consider defendant’s exception to Finding 6, we have carefully examined the entire record to determine what additional finding might be justified. This study has resulted in our making Finding 25 which reads as follows:
As stated in finding 6, Acme performed contracts for other agencies of the United States than the Maritime Commission during the period from May 1, 1943 to August 14, 1945. Aside from the contracts performed for the Maritime Commission, the only contracts which Acme had with Government agencies between September 16,1940 and August 14,1945, were two or three purchase orders performed by Acme for the Army and the Navy. The total consideration paid to Acme on such other contracts aggregated $4,025. The Maritime Commission’s auditor found that on a portion of such contracts, for which the consideration paid Acme aggregated $2,000, Acme sustained a loss. The evidence does not establish whether a profit or a loss was sustained on the remaining contracts, m which the total consideration paid Acme amounted to $2,025, but it is a reasonable conclusion from the record as a whole that Acme’s profits on all Government contracts, excluding the Maritime Commission contracts, did not exceed the sum of $506.25.
Section 2 (b) of the Lucas Act provides:
Every claimant under this Act shall furnish to the department or agency concerned any evidence within the possession of such claimant bearing upon the matters referred to in subsection (a) of this section.
The Maritime Commission auditor, who spent several months making his audit of Acme’s affairs felt convinced, and this court is also convinced that all the evidence within the possession of Acme bearing on the matter of its net loss was furnished to the Maritime Commission. Acme, to the best of its ability, bore the burden of establishing its net loss *473 within the meaning of Section 2 (a) and (b) of the Lucas Act. If the defendant knew of any additional evidence of other government contracts performed by Acme within the statutory period, aside from the contracts aggregating $4,025 established by the evidence herein, it should have produced such evidence.[4] We accordingly conclude that Acme has complied both with Section 2 of the Act and with paragraph 305 of the Executive Order and that Acme’s net loss on all its wartime Government contracts can be determined from the evidence submitted.
Defendant next contends that plaintiffs may not recover because Acme failed to comply fully with certain provisions enumerated in paragraph 202 of the Executive Order.
Subparagraphs (b) and (c) of paragraph 202 require of a claimant a statement of the contract price, cost of performance, loss claimed for each war contract or subcontract with respect to which claim is made, and a statement of the contract price, cost of performance and profit or loss on each contract, identifying each contract by agency, number and date. Plaintiffs have conceded and we have found that on all the evidence available it was impossible to fully comply with these requirements. We do not believe that this is as serious a defect as might at first appear. All the Maritime contracts were for the fabrication of oil storage and settling tanks to be installed in pairs on ships and were designated as ship sets. Acme was required to furnish both the materials and labor for the completion of the work in accordance with the specifications. The “contracts” proper took the form of purchase orders which were issued to Acme by the Maritime Commission from time to time during the statutory period. Actually these purchase orders amounted to one contract, and although detailed information as required by paragraph 202 (b) and (c) would have been preferable, the lack of it is not, we think, fatal.
Next defendant states that plaintiff failed to furnish a statement of any other relief sought from the Government with respect to the losses claimed as required by subpara- *474 graph (g). In our finding 5 we stated that no action has been taken with respect to Acme’s Maritime Commission contracts under the Renegotiation Act, the Contract Settlement Act of 1944, or similar legislation and that no relief has been granted Acme or its assignee under Section 201 of the First War Powers Act of 1941, or any other type of relief under any other act. It is believed that subparagraph (g) has been sufficiently complied with. That finding also disposes of defendant’s contention respecting Acme’s alleged failure to comply with subparagraph (i) requiring a statement in detail of all claims and settlements made under section 17 of the Contract Settlement Act.
Subparagraph (]') requires a detailed statement of the facts and circumstances causing the loss and the periods of time during which loss occurred. Defendant seems to be alluding to the fact that Acme was unable to supply minute details concerning each and every purchase order. Inasmuch as all the purchase orders were for the same supplies and services and in reality constituted one contract, the evidence supplied by Acme concerning the circumstances under which the work was performed and the losses incurred, sufficiently meets the requirements of subparagraph (j).
Defendant urges that plaintiffs have failed to comply with subparagraph (k) which requires “A statement, supported by reasonable detail, showing that the loss or losses claimed occurred through no fault or negligence on the claimant’s part.” Defendant refers specifically to the circumstances involved in repairs to tanks which Acme had to make and asserts that any excess costs arising by virtue of the necessity of making the repairs was due to Acme’s own fault and negligence. The facts concerning the repair to the tanks are set forth in detail in our findings 15 and 16. It appears that the Government had the right to make inspection of the tanks fabricated by Acme either before or after shipment. All but eleven of the shipsets were inspected and approved by defendant at Acme’s plant before being shipped on Government bills of lading to the three shipyards designated by defendant. After a number of tanks had been shipped, Acme was advised by the East Coast Regional Office of the Maritime Commission that the shipyards had *475 complained that some of the tanks received were in need of repairs because of broken ladder rungs, missing manhole covers, and dirt in the tanks. Saul and Louis Waxman went to the Bethlehem-Fairchild Shipyard in Baltimore to investigate the trouble and found a number of the tanks lying uncovered in the open on soft dirt with the manhole covers on the ground beside them. Some of the ladder rungs had been broken and dirt had gotten into the tanks because the manhole covers had been removed. Before those tanks had been shipped from Acme’s plant, the manhole covers had been gasketed and bolted to the front of the tanks and the two flanges on the top of each tank had been fitted with corks to keep them airtight. The Waxman partners found that with respect to the tanks complained of, the corks were missing and the manhole covers were lying on the ground. The damaged tanks at the Baltimore shipyard were returned to Acme and repaired in its plant. Since the West Coast shipyards were far distant from Acme’s plant, the Maritime Commission directed those shipyards to repair the tanks in their yards. When Acme’s contracts were terminated, the Maritime Commission submitted a bill to Acme for $27,-194.80 for the cost of repairing the tanks on the West Coast. At that time Acme was in severe financial straits, owing more than $40,000 on loans obtained to perform the contract with interest accruing thereon at the rate of two percent per month. In addition, the Government was admittedly indebted to Acme in the amount of $21,925.59 for work on the contracts and for termination expenses. Defendant refused to pay Acme any portion of that amount until Acme paid the repair bill. Acme insisted it was not responsible for the damage to the tanks and the dispute was not settled until April 24,194-7 when Louis Waxman and the President of Atlantic Corporation were informed by representatives of the Maritime Commission that, unless Acme made a settlement of the repair bill, payment of the amount due Acme by defendant would probably be held up for years. Under these circumstances, Acme and Atlantic compromised the defendant’s claim for $11,000 which was paid by a check of Atlantic Corporation, and thereupon the defendant paid Acme the balance of $21,925.59 due on the contracts.
*476 Our commissioner has found and we concur in the finding, that there is no evidence that the tanks were not made in strict accordance with the defendant’s specifications, or that the damage to the tanks necessitating the repairs was due to the fault or negligence of Acme. We have, accordingly, included as a cost of performance of the' contracts (in determining Acme’s net loss) an item representing repair of tanks, and we have found (Finding 20) that Acme’s losses on its Maritime Commission contracts including the losses attributable to the repair of tanks, were incurred without fault or negligence on Acme’s part. We believe that the evidence supplied by Acme contained sufficient detail to justify such a finding and that Acme has complied with subparagraph (k) of paragraph 202 of the Executive Order.[5]
Subparagraph (m) requires a statement showing the amount by which any loss, in respect of which a claim is made, reduced income or excess profits taxes of the claimant for any taxable year or years. The record, which we believe was as complete as Acme could make it, indicates that Acme did not receive any tax relief on account of losses (see Finding 5) incurred in the performance of its Maritime Commission contracts.
Subparagraph (n) requires an affidavit by two officers or other responsible officials of the claimant, one of whom must be the chief accounting officer, that the data in the claim and supporting papers have been carefully verified from the accounting and other records of the claimant, have been prepared in accordance with the requirements of the Lucas Act and the Executive Order, and are in all respects true and correct to the best of their knowledge and belief. Defendant asserts that since only Samuel Waxman verified the *477 claim, this requirement has not been met. From 1917 to 1937 Samuel Waxman operated as a manufacturer of small iron products under the name of Acme Iron Works. In 1937 his son, Saul, became associated with his father in the business. In 1942 Samuel entered into an informal partnership agreement with his three sons. The agreement was never reduced to writing. The contracts with the Maritime Commission were signed “Acme Iron Works by Samuel Wax-man”. Saul Waxman assisted his father in all work under the contracts. Louis Waxman assisted during the period after April 1, 1944. Harry, the youngest son, entered the armed services and was in the Army throughout the contract period. Acme was neither a corporation nor a formal partnership. There was no chief accounting officer. The data material to Acme’s claim was for the most part developed by the Maritime Commission’s auditor with the help of Samuel and Saul Waxman and there is no real dispute as to the accuracy of the figures produced by the auditor. Literal compliance with the detailed provisions of paragraph 202 (n) would be impossible for many small unincorporated businesses. We suppose that the purpose of the regulation was to insure insofar as possible the accuracy and reliability of the details of a claim. We are persuaded that Acme complied to the greatest extent possible and that this is all that is required by Section 2 (b) of the Lucas Act and the spirit of the regulation.
A careful consideration of the entire record in relation to the requirements of paragraph 202 of the Executive Order impels us to the conclusion based on the facts stated in finding 19, that despite Acme’s failure to comply in certain technical respects with the exact requirements of the Executive Order, the claim filed substantially met the requirements of the regulation; that after considerable effort, Acme submitted the best information available and that its failure to comply with the precise details of the regulations were not sufficient to prevent the Maritime Commission from making a reasonably accurate determination of the amount of Acme’s net loss on all Government contracts performed during the statutory period.[6]

*478
Paragraph 307 of Executive Order 9786

Defendant contends that plaintiffs may not prevail because Acme has not met the requirements of Paragraph 307 of Executive Order 9786 which provides:
Relief with respect to a particular loss claimed shall not be granted under the Act and these Regulations unless the war agency considering the claim finds, or, in case such loss was incurred under the contracts and subcontracts of another war agency, such other war agency finds, that relief would have been granted under the First War Powers Act, 1941, if final action with respect thereto had been taken by the war agency on or before August 14, 1945.
Defendant states that not only has Acme failed to show that its claim would have been acted on favorably under the First War Powers Act if final action thereon had been taken by the Maritime Commission prior to August 14, 1945, but that the Maritime Committee on Claims itself stated, in denying plaintiff Lucas Act relief, that “under the circumstances of this case, this Committee is unable to find that relief would have been granted to Acme under the First War Powers Act, 1941, if final action with respect thereto had been taken by the Commission on or before August 14, 1945.”
A number of District Courts and this court have held that Paragraph 307 of the Executive Order is in conflict with the manifest meaning of the Lucas Act. Defendant, however, has asked that we reconsider the matter in the light of Senate Report 1669, 79th Cong., 2d Sess., July 9, 1946, accompanying the Lucas Act as it was finally enacted. That report states, among other things, that
This bill, as amended, would afford financial relief to those contractors who suffered losses in the performance of war contracts in those cases where the claim would have received favorable consideration u/nder the First War Powers Act a/nd Executive Order 9001 if action had been taken by the Government prior to the capitulation of the Japanese government. [Italics supplied.]
Defendant urges that such a statement of legislative purpose could hardly be clearer and that it should be given much *479 greater weight than individual comments made in debates on the floors of the House and Senate.
The Senate Report to which defendant refers was a very brief report made after an equally brief Lucas Act had been the subject of lengthy hearings, and was then completely rewritten in Committee conference. The bill as originally introduced differs in many material respects from the bill rewritten in conference after hearings and finally passed in July of 1946. The Senate Report relied on by defendant accurately reflects practically the sole legislative purpose of the Lucas Act as introduced. As finally amended and passed, the Senate Report reflects accurately only one of the purposes of the bill. Why this is so, we do not know. To construe this report as a statement of the only purpose of the Lucas Act would require us to completely ignore most of the provisions of the act as enacted into law. As far as we know, there has never been published the usual detailed committee report on the amendments made by the Congressional committee following the hearings.
As introduced, the Lucas Act contained only two sections. The first section empowered the President to delegate to any department or agency of the Government, authorized to modify without consideration war contracts under section 201 of the First War Powers Act, the power to continue to make such modifications “whenever the head of such department or agency makes a determination that such action is necessary to prevent a manifest injustice to a firm, corporation, or individual who has furnished supplies or services for the Government; * * Later in the same section there appeared the following proviso:
Provided, further, That this section shall not be applicable to cases submitted under section 201 of the First War Powers Act, 1941, which have been finally disposed of under such section upon their merits prior to August 14, 1945.
The above proviso is nearly identical with Paragraph 204 of Executive Order 9786 which provides in part that “no claim shall be considered if final action with respect thereto was taken on or before that date. [August 14,1945].” The proviso above quoted was not included in the Lucas Act *480 as amended and passed and, on the contrary, that act provided that “a previous settlement under the First War Powers Act, 1941 * * * shall not operate to preclude further relief otherwise allowable under this Act.” In Howard Industries v. United States, 113 C. Cls. 321, we held paragraph 204 of the Executive Order to be void under the Act.
As originally introduced, the Lucas Act provided for no appeal whatever from any agency action taken under that act, and the act in essence was no more than an extension of Section 201 of the First War Powers Act with one difference, i. e. that the criteria for granting a modification without consideration to a contractor would be not only a finding by the agency that such action would aid in the prosecution of the war, but also that such action “is necessary to prevent a manifest injustice.” This new criterion for relief, however, represented a major difference between that proposed legislation and Section 201 of the War Powers Act. As brought out conclusively in the hearings, and as mentioned in the July 9,1946, Senate Keport, the primary purpose of Section 201 was to aid in the successful prosecution of the War and was in no sense intended as an aid to contractors. (See testimony of Col. E. M. Bran-non, Judge Advocate General’s Department, War Department, on pages 62 and 63 of the Hearings.[7]) With respect to the proviso quoted above, Mr. Weitzel, a representative of the General Accounting Office, made the following comments to the Subcommittee:
Then, the provisions of the bill are not to be applicable to cases finally disposed of on their merits under section 201 of the First War Powers Act prior to August 14, 1945. This provision would seem to exclude many cases which presumably, if they had any merit, were determined prior to that date, and might leave rather a small area upon which the bill could operate. [Hearings, p. 28.]
It became increasingly clear, as the hearings progressed, that any “relief” afforded a war contractor under Section 201 of the First War Powers Act, had little if any relation to the merits, justice or equity of his claim — that his contract *481 was modified, if at all, only to the extent that the contracting agency found that such modification would benefit the Government in prosecuting the war.
Some of the Government agencies called upon to testify objected to any change in the criterion to be applied to the proposed modification of contracts and felt that the Lucas Act should merely extend the identical authority granted under Section 201 so that only those modifications would be made which could be found to aid the Government in prosecuting whatever work was necessary as a result of the termination of hostilities (post V-J day necessities). Those witnesses who favored a criterion in addition to “benefit to the Government,” i. e., to “prevent manifest injustice,” objected that the “manifest injustice” yardstick was too indefinite.
In a letter introduced at the hearing, the War Department stated:
It is understood that the purpose of S. 1477 is to afford financial relief to those contractors who suffered losses in the performance of war contracts in those cases where the claim would have received favorable consideration under the First War Powers Act and Executive Order No. 9001 if action had been taken prior to the capitulation of the Japanese Government. The War Department is in general accord with this purpose. * * * * * * It is considered that the relief granted under S. 1477 should not be broader than that granted under the First War Powers Act. [Hearings, p. 6, italics added.]
The above quoted language of the War Department letter is strikingly similar to the language of Paragraph 307 of Executive Order 9786.
The Act as introduced would have permitted consideration only of those claims which had not been finally determined under the First War Powers Act prior to August 14, 1945, and which would have justified a finding by the agency involved that the contract modification requested would have been of benefit to the Government in prosecuting the war. The “manifest injustice” referred to apparently had nothing to do with the merits of a particular contractor’s claim for relief under the First War Powers Act, but rather was directed to the fact that if the war had not ended when it did, *482 certain cases which had been under consideration for a long time would have received favorable action, whereas other cases which had received prompt attention, got in under the August 14,1945, line. The record of the Subcommittee hearings clearly indicates that as the Congressmen learned of the restricted and narrow application given to the powers granted under Section 201 of the First War Powers Act, they decided that a mere extension of that act would not be certain to afford relief to war contractors who had suffered losses in the performance of work for the Government. The act was accordingly rewritten and instead of merely permitting a contractor to apply for consideration under the First War Powers Act, the act created a right of action, equitable in nature, against the United States, to recover net losses incurred in the statutory period as a result of the performance of war contracts. In order to qualify for such an award, a contractor had to show that the losses were suffered without fault or negligence on his part. He did not have to show that a Government agency would or would not have considered that an amendment to his contract prior to August 14, 1945, would have aided the United States in the prosecution of the war. The award, either by the agency or the court on appeal, was to be “fair and equitable”. The fact that the contractor had received First War Powers Act “relief” or had been denied such relief was no bar to a claim under the Lucas Act.
Since a prior denial of relief under the First War Powers Act is clearly, by the very terms of the Lucas Act, no bar to a claim under such act, how can it be said that the mere likelihood of such a denial of First War Powers Act’ under the criterion established for such relief constitutes a bar under the Lucas Act? But this is precisely the requirement that Paragraph 307 imposes on Lucas Act claimants and we do not believe the Act had any such purpose despite the language in the Senate Report. At most, perhaps, the Senate Report merely purports to describe one situation of several, in which a claimant might expect Lucas Act relief, i. e., when it had a claim pending which would have received favorable consideration under the First War Powers Act had final action been taken prior to V-J Day. The Report *483 does not say that this was the only purpose of the act, and a reading of it reveals that it had several other purposes.
In conclusion we hold that Paragraph 307 imposes restrictions never intended by Congress in enacting the Lucas Act, and is accordingly void.[8]

Acme’s Net Lass

We have found (Finding 26) that the costs incurred by Acme in the performance of all Government contracts in the statutory period exceeded its net receipts in the total amount of $28,483.60 as follows:
Operating expense (Fdg. 20)-$242,452.80
Partners’ salaries (Mg. 22)- 33,788.96
Rent (Mg. 23)- 5,816.45
Loss on steel purchased and scrapped (Mg. 24)_ 1,650.11
Interest on loans to Aug. 14,1945 (Mg. 21)_$14,376. 74
Less: Interest in excess of interest at 6% per annum- 9, 771. 62
-- 4, 605.12
Total- 288,313.44
Total payments received (Mg. 10)_ 259,323. 59
Total excess costs on M. O. contracts_ 28,989.85
Less: Estimated profit on other Government contracts (Mg. 25)- 506.25
Net Loss on All Contracts_ $28,483.60
Both defendant and plaintiffs have raised objections to certain of the items making up the above computation.
With respect to the item of operating expenses which we found to have been $242,452.80, plaintiffs object to the amount found allocable to “Indirect Expense” which is shown in our Finding 20 as $27,445.61. The items comprising “Operating Expenses Incurred” are set forth in Finding 20 as follows:
Direct labor_$88, 381.70
Indirect labor_ 7,624.93
Materials_ 72,781.11
Direct charges_ 28,281. 63
*484 Indirect expense-$27,445.61
Bank charges- 126.22
Depreciation_ 3,848.92
Insurance_ 2,752. 04
Taxes_ 3,942. 64
Travel_ 7,268.00
Total_$242, 452. 80
Plaintiff contends that the “Indirect Expense” item should have been $38,188.56 for the following reasons. According to plaintiff, its accountant, Mr. Freedman, determined that Acme’s expenditures for “Materials” was $81,802.79 which is greater by $9,021.68 than the amount found by the Maritime Commission auditor, Mr. Tartter and reflected in the above table (Finding 20). Plaintiff’s accountant, Freedman, finally accepted Tartter’s figure ($72,781.11) as being correct but thereupon transferred the difference of $9,021.68 to “Indirect Expense” on the theory that if it did not belong in the category of “Materials” it must belong in the category of “Indirect Expense.” This assumption is not unreasonable if the amount in question is actually a valid charge.
It appears from the record that Mr. Freedman (plaintiff’s accountant), without a detailed audit to determine the accuracy of plaintiff’s books of account, accepted and used the costs of material purchases as they were reflected in Acme’s ledger accounts, and set them up in the amount of $81,802.79 (Plaintiff’s exhibit 9, schedule III). Mr. Tartter, the Maritime Commission’s auditor, examined plaintiff’s books and found that they could not be used to construct any reliable cost data; that there was a “maze” of incorrect entries, unexplained journal entries, and mathematical errors; that payment of numerous invoices was charged in the cash book to Accounts Payable Control whereas such invoices had never been recorded as credits in the Accounts Payable Detail Ledger. On the other hand, he found that payments of numerous invoices were charged in the Cash Book directly to Material, etc., whereas they had been recorded in the Purchase Journal as a charge to Material, etc., and a credit to Accounts Payable. Acme’s general books for the calendar year of 1943 were missing, and it was found necessary to write to a large number of vendors for copies *485 of over 400 invoices which were charged to Material or Overhead in 1944 and 1945, and which were missing. (Defendant’s Exhibit 5, pp. 20, 21). Accordingly, Mr. Tartter developed the cost on a purely fundamental cost basis, allowing only such costs as were evidenced by individual job cost cards, individual time cards, tax reports, and accounts payable invoices. By this method, Mr. Tartter determined that the cost of materials purchased by plaintiff was in the amount of $72,781.11. Freedman did not dispute Tartter’s figure, but assumed that the difference between his own and Tartter’s “Materials Costs” could properly be regarded as “Indirect Expense” and accordingly, Freedman transferred that difference to that account. The record does not reveal that this difference of $9,021.68 was further looked into or authenticated before or after Freedman made its transfer from one account to another, but there is no dispute as to the accuracy of the $72,781.11 found by Tartter. Mr. Freedman testified that he had no satisfactory explanation of the difference between his figure and that of Tartter’s, and that he deducted the $9,021.68 and transferred it to “Indirect Costs” on the assumption that it must have represented certain supplies or indirect materials. (Transcript of Testimony, pp. 259,260).
With regard to Indirect Expense, Mr. Freedman found that Acme’s books reflected a total of $27,243.92. To this however, he added the $9,021.68 above discussed, and a further sum in the amount of $12,168.23. In his report, Freedman explained this latter sum as being “Expenditures Capitalized by USMC auditor and claimed by Owners of Acme Iron Works to be of an indirect expense category.” He testified that Louis Waxman had told him that they were fixed assets that Acme had at the beginning of the contract which were used up in the performance of the contracts, and that Waxman had given him a list which totalled $12,168.23. (Transcript of Testimony pp. 271, 272.) This list is not in evidence nor is there any detailed statement of the items which make up the total of $12,168.23.
By combining the above amounts, i. e., $27,242.92, $9,021.68 and $12,168.23, Freedman arrived at a total cost for Indirect *486 Expense of $48,433.83. From this latter amount he arbitrarily deducted $10,245.27 to arrive at a final Indirect Cost of $38,188.56 which deduction he explained as follows:
Adjustment to bring into agreement with net amount agreed upon by the Committee on Claims and amount disallowed for private work.
Mr. Tartter, the Maritime Commission’s auditor, found from his examination, that the total Indirect Expense incurred by Acme in connection with the Maritime Commission contracts was in the amount of $27,445.61. Subsequent to this determination, and on September 10, 1947, Tartter submitted a supplemental report to the Maritime Commission in which he stated:
On September 9, 1947, Messrs. Louis and Saul Wax-man, representing the Acme Iron Works, advised that they were revising or amending their claim under Public Law 657 to claim additional costs. I am, accordingly, submitting an amendment to my audit report in order to give consideration to the additional costs now claimed by the Acme Iron Works.
In his Supplemental Report (Defendant’s exhibit 6), Mr. Tartter added $10,742.95 to the above $27,445.61 with the explanation: “Equipment Acme claims to be of Expense nature”. The sum of these figures is $38,188.56. The Maritime Commission included this latter figure in a statement disallowing the claim. Mr. Tartter testified herein that he prepared this supplemental report “Only to give' effect to certain changes which were shown in an amended claim filed by Louis and Saul Waxman.” We do not think that the validity of this additional claim has been established in the record, although Mr. Freedman in his audit report gives it an appearance of authenticity, and accordingly we hold plaintiffs’ obj'ection to the “Indirect Expense” item in Finding 20 to be without merit.
Partners’ Salaries
Defendant contends that no salary payments to the Wax-man partners is properly applicable to the cost of performing the Maritime Commission contracts for the purpose of *487 determining the net loss incurred and allowable under the Lucas Act. Defendant urges that although partners may agree upon any plan they choose for drawings, such drawings must be charged to their capital account according to recognized commercial practices because each partner in acting for the partnership is merely taking care of his own interest growing out of the partnership, citing W. A. Paton, Accountant’s Handbook, 3rd Ed., citing Kester, Principles of Accounting, p. 1244, Sec. 23:
In the accounting for an ordinary partnership such items as * * * salaries to partners, etc., are not to be considered as expense items to be deducted from profits before the net earnings are determined, but as a part of the net profits to be distributed to the several owners of the business. It is true that partnership agreements often provide that partners’ salaries— * * * are to be recorded as expenses, but this is merely a method of determining the portion left for distribution in profit- and-loss ration and does not convert the prior deductions into expenses. The allowance of salaries and interest on capital is made simply for the purpose of distributing net profits according to certain methods agreed upon by members of the firm.
Both parties refer to the legislative histories of H. R. 3436, 81st Cong. 1st Sess., and S. 3906, 81st Cong. 2d Sess., representing two attempts by Congress to make “clarifying” amendments to the Lucas Act, among which was a provision to insure the allowance as a cost of performance, of reasonable compensation to partners. Both bills were vetoed by the President, and we do not think it is necessary to rely on the legislative history of those bills to settle the instant issue.
We do not disagree with the quotation from Paton’s Handbook set forth above, but we think that the rule enunciated relates solely to the division of profits among partners and that is not an issue in this case. It is quite true that, generally, the payment of salaries to partners is a method used to equalize a division of profits in accordance with the individual partner’s contribution to the common venture as agreed upon in the partnership agreement, and the amount of such salaries may properly be excluded from the operating expenses in determining the profit or loss outcome of the *488 business in the period of operations, insofar as the partnership is concerned. However, that is not to say that partners’ salaries are not a part of the operating expenses of the business, provided, of course, that the services performed by the salaried partners are essential to the functioning of the organization and would be required whether they were performed by a partner or by recruited personnel. In other words, where such services are essential to the operation of the business, the cost of such services is properly a charge to operating expenses without regard to who performs them. We shall describe briefly the services performed by Samuel, Saul and Louis Waxman in connection with the Maritime Commission contracts to determine whether or not such services were essential to the performance of those contracts and therefore includible as costs of the work.
During the performance of the Maritime Commission contracts it was agreed that the working partners, i. e., Samuel, Saul, and Louis, would receive salaries for their supervisory services. The evidence is vague and conflicting with respect to the amount of salary each was to have been paid, although plaintiffs claim that the three working partners were to be paid a salary of $13,000 each per annum.
The financial condition of the business was such that the salaries actually paid were $50 per week to Samuel Waxman (the father) and $40 each per week to Saul and Louis. Samuel and Saul were operating Acme at the time the Maritime Commission contracts were entered into, but Louis Waxman did not begin working actively in the business until about April 1, 1944. On the basis of the salaries actually received by the three working partners during the performance of the contracts, the sum of $11,521.30 is applicable to such contracts.
The modest salaries which the three partners actually received did not represent fair and reasonable compensation for the value of the services which they actually performed on the Maritime Commission contracts. During the same time such small salaries were paid to the partners, some of Acme’s skilled employees were earning as much as $140 to $150 per week, including overtime. Samuel Waxman acted as general manager of the firm; Saul Waxman was *489 production, manager, and Louis Waxman bandied the administrative affairs of tbe business. Aside from foremen in the sbop, these three men provided all the managerial and supervisory services which Acme had available for the production of the tanks for the Government. Prior to these contracts, Samuel and Saul Waxman had generally worked the standard 40-hour week, but during the performance of the contracts the three partners worked an average of fourteen hours a day on weekdays, and they also worked on most Sundays. The Sunday work was necessary in order to lay out the work so that there would be no delay when the workmen returned each Monday morning.
From the above facts we conclude that the services performed by Samuel, Saul, and Louis Waxman were essential to the performance of the Maritime Commission contracts, and the reasonable value of such services is properly includible in the costs of the work performed.
Paragraph 101.7 of Executive Order 9786 provides that the “cost of performance” includes the reasonable and necessary cost to a contractor of work, supplies, or services, and subparagraph (b) prohibits the inclusion of unreasonable compensation for services or bonuses which actually constitute a distribution of profits. We agree with defendant that the salaries claimed by plaintiffs, i. e., $13,000 per annum to each of the three Waxmans, is unreasonable. A careful review of the whole record persuades us that reasonable compensation for the managerial and supervisory services contributed by the three partners to the performance of the contracts amounts to the sums of $7,600 per annum for Samuel Waxman from May 1, 1943 to August 14, 1945; $6,000 per annum for Saul Waxman from May 1, 1943 to August 14, 1945, and $6,000 per annum for Louis Waxman from April 1, 1944 to August 14, 1945. These figures conform to those found by the Committee on Claims of the Maritime Commission when it was considering the Acme Lucas Act claim. The portion of such salaries that are properly allocable to the Maritime Commission contracts amounts to the sum of $33,788.96 and this amount is a proper item of cost to be considered in determining Acme’s net loss.

*490
Bent

In Finding 23 we determined that rent on the premises occupied by the Acme Iron Works in the amount of $5,816.45 was properly allocable to the Maritime Commission contracts during the statutory period. This figure was based upon the accrued rental of $200 per month and real estate taxes paid during the performance of the contracts.
Acme Iron Works occupied an area of 26,000 square feet of corner property in Roxbury, Massachusetts, which was acquired in August 1942, by Samuel Waxman as agent for his wife, Bertha, at a tax sale held by the City of Boston, for a consideration of $4,800. The improvements on the property included one large wooden building, 100' x 50', one stone building, 37' x 37', one two-story brick building, 25' x 25', and a series of wooden structures, 170' x 30'. The open area of the property contained approximately 13,900 square feet.
During its occupancy of the premises, Acme altered and strengthened the large wooden building by constructing new foundations and cement-block walls under the roof to replace the wooden siding, at a cost of approximately $9,000. A new heating system was installed at a cost of about $2,800. In order to manufacture the tanks for the Maritime Commission, it was necessary for Acme to purchase and install cranes and hoists, and to lay concrete bases and erect suitable structures to support these facilities.
Although no rent was actually paid to Bertha Waxman, plaintiffs claim that Acme agreed to pay Bertha $1,300 per month, and also to pay the real estate taxes on the property, and that a proportionate share of this rental should be allocated to the costs of performing the Maritime Commission contracts.
The partnership filed its Federal income tax returns on the accrual basis, and its tax return for the fiscal year beginning April 1, 1944 and ending January 31, 1945, show that rent accrued to Bertha at the rate of $200 per month. This amount is also reflected in a journal entry in Acme’s books. Acme also paid the real estate taxes on the leased property.
*491 We find no merit to plaintiffs’ or defendant’s objections to the amount we have determined to be reasonable and allowable as rent and have allocated that amount as a cost of performing the Maritime Commission contracts.

Interest

We have shown as a cost of performing the Maritime Commission contracts $14,376.74 representing interest incurred, up to August 14, 1945, on funds borrowed by Acme for the performance of those contracts. Defendant contends that no part of such interest is allowable, and plaintiffs contend that an additional amount representing interest accruing subsequent to August 14, 1945, should be allowed as a necessary cost.
When the first of the Maritime Commission purchase orders was awarded to Acme in 1943, it owned machinery and equipment worth about $18,500 but it had no capital with which to finance the current costs of manufacturing operations or to acquire the additional equipment and machinery needed to manufacture the tanks for the Government. It succeeded in borrowing some funds from Auto Insurance Finance Corporation at an agreed interest of approximately six percent per annum, but because of Acme’s larger financing requirements, it was obliged to find some source from which it could secure funds in much greater amounts. It endeavored to borrow the necessary funds from a number of commercial banks but these efforts were not successful. It then applied to the Reconstruction Finance Corporation which, at that time, was making loans through participating banks under an arrangement by which the RFC approved the loan and guaranteed 75 percent thereof to the participating bank which advanced the funds to the borrower. One or two applications were made to the RFC prior to December 1, 1943, but these did not result in any loan approvals. On January 5, 1944, however, the participating bank was notified by the RFC that it had approved a loan application which Acme had filed on December 1, 1943, in the amount of $35,000. After it had received the papers from the RFC, the participating bank refused to execute them and the loan commitment was canceled on February 21,1944. Acme then *492 requested EFC to make a direct loan to it, and after the partners had telephoned to and called personally at the Boston office of the RFC on several occasions, they concluded that the loan would not be approved. In the meantime, Acme, being badly in need of funds for operating purposes, had applied to and obtained a loan from the Atlantic Corporation (plaintiff-assignee, herein), a private finance company in Boston. On March 4, 1944, Acme finally notified RFC that it had succeeded in obtaining a loan from a finance company and was, therefore withdrawing the loan application made to that agency.
The Atlantic Corporation advanced considerable sums of money to Acme from time to time during the performance of the contracts and charged interest on the loans at the rate of 3% for the first month and 2% per month for each month thereafter.
There is no law in Massachusetts limiting the rate of interest that may be charged on loans in excess of $1,000 where the loan is evidenced by a written obligation. Commercial banks in Boston commonly lend money at rates of interest which vary from iy2 percent per annum on commercial paper purchased by banks, to 12 percent per annum on loans secured by chattel mortgages. Finance companies, such as Atlantic, in the Boston area, usually charge interest at the rate of from one percent to three percent per month on loans made by them. The Atlantic Corporation usually charges an interest rate of two percent per month on its loans, but in some instances charges higher rates. In a number of instances, referees in bankruptcy in Boston have approved loans obtained from finance companies, whose loans were secured by a lien against the assets of the bankrupt and bore interest at the rate of two percent per month. The Atlantic Corporation has made such loans.
Of the total amount of interest incurred by Acme on loans advanced between the date of the first Maritime Commission contract in 1943 and August 14, 1945, and which is allocable to the Maritime Commission contracts, the sum of $13,127.77 was incurred on loans made by Atlantic, and $1,248.97 was incurred on loans made by Auto Insurance Fi *493 nance Corporation, The total interest thus incurred of $14,376.74 was reported in the audit of the Maritime Commission’s auditor under the heading of “Supported Costs Applicable to the Maritime Commission Contracts.” Of this amount $13,305.19 is applicable to work performed on the purchase orders and $1,071.55 to the repair of tanks (discussed elsewhere herein).
Defendant makes a number of contentions in support of its position that interest on borrowed money is not here in-cludible as a necessary cost of performance of the contract. It relies on the case of Austin Company v. United States, 58 C. Cls. 133. We are unable to see how that case is any authority for defendant’s position. In that case a cost-plus contract was involved and plaintiff was claiming a sum alleged to be due it as damages for loss because of delays of defendant’s representative in passing upon plaintiff’s bills and making payment thereof. Plaintiff contended that the loss or damage incurred could be measured by the amount of interest plaintiff had to pay on money borrowed by it in excess of what it would have borrowed if the defendant had made monthly payments to plaintiff more expeditiously. In denying the claim the court held first that the method proposed for formulating the claim was too speculative. Next, the court pointed out that the General Provisions of the contract put the contractor on notice that it should not expect payments promptly at the end of each month, but only as soon as practicable “after the end” of each month. The court further stated' that while under the contract in suit the Government undertook to pay plaintiff for the “cost of the work,” the contract set forth with much particularity a definition of the “cost of the work” from which definition the court was unable to deduce the particular item of interest claimed as a cost. Finally the court stated that if the item of interest could be construed as a “necessary expense connected with the work not specifically excluded in the ‘addendum’ to the contract, it would then have to be denied in the absence of an approval ‘by the officer in charge as representing actual and essential elements in the cost of the work.’ ” Not being deducible from the contract definition *494 of “cost of the work,” and not baying been approved by the contracting officer as a “necessary expense”, it was not allowed.
Defendant also relies on the case of Ramsey v. United States, 121 C. Cls. 426. In that case, plaintiffs, trustees in bankruptcy, sought to recover damages for the alleged breach of contract by the Government arising out of the Government’s failure to pay for the articles produced under the contract within a reasonable time as the contract implied it would. In stating the damage suffered by the alleged breach, plaintiff included several items of interest, including interest on bank loans. The court held that in essence, a plaintiffs’ claim was for damages arising out of an alleged breach of a contract to pay money and that the only measure of damages which plaintiff could recover for such delay would be legal interest on the principal amount withheld by the Government. The court then pointed out that although this was the common law rule, the Government may not pay interest on claims awarded against it in the absence of consent by statute, or unless agreed to in the particular contract. In the instant case, the interest urged as a necessary cost of performing the contract is in no sense interest on a claim against the Government. The Ramsey case is inapposite.
Defendant’s argument that Acme did not need to borrow from Atlantic and could have gotten its loans from other financial institutions at a much lower rate of interest, is not supported by the record. It is true that when Acme withdrew its loan application from RFC in March 1944, it had not been refused such loan. Neither had it been given any indication as to whether the loan would be approved and if so, when. It had been negotiating with the RFC for several months and its need for large financing to perform the contracts which had been entered into in May of 1943, nearly a year previously, were becoming too pressing to permit of any further delay. The proof is adequate that without the financing provided by Atlantic in February, 1944, Acme would not have been able to continue performance of the contracts.
Finally, defendant urges that if allowed as an item of cost in computing Acme’s net losses, interest at the rate of six *495 percent “would be liberal”. Despite the fact that the very high rates' paid by Acme on the Atlantic loan were entirely legal in Massachusetts, and although Acme failed to secure adequate financing at a lower interest rate only after it had made every effort to do so, we do not think that the Government should in equity be required to compensate the contractor for interest paid in excess of the usual rate of six percent. Pursuant to Section 6 of the Lucas Act, this court has jurisdiction to make a determination of the “equities involved” in plaintiffs’ claims and to determine the amount to which plaintiffs may be “equitably entitled.” A contractor’s right to recover does not stem from a legal or contractual right, and its recovery under this Act will be the amount which, under all the facts and circumstances established by the record, appears to the court to be just and equitable. In this case we believe that interest at six percent on the funds borrowed to perform the contracts is equitable.
Interest on working or borrowed money, as distinguished from interest on invested capital, has frequently been allowed as a cost of performing Government contracts. Executive Order 9786 forbids allowance, as a cost of performance of interest on “invested capital”, but says nothing about interest on “working capital” such as under consideration herein. In determining the amount of net loss suffered by claimants under Section 5 of the Dent Act (War Minerals Relief Act of March 2,1919, 40 Stat. 1272, amended November 23, 1921', 42 Stat. 322 and February 13, 1929, 45 Stat. 1166), interest on borrowed money expended by claimant for the production of minerals under Section 5 was taken into account as part of plaintiff’s costs of the undertaking. Wilbur v. U. S., 284 U. S. 231 (1931), Wilbur v. U. S., 59 F. 2d 887 (1932). In the matter of Enjay Construction Company, decided November 18,1948, by the War Contract Hardship Claims Board (4 CCF, para. 60, 588), the Board allowed as a necessary expense of performing the contracts, interest incurred by claimant on working capital which it had borrowed from a bank.
Plaintiffs contend that the interest paid by Acme subsequent to August 1’4,1945 on working capital borrowed from Atlantic prior to that time should also be taken into consid *496 eration as an allowable cost of performance in determining Acme’s net losses. The Enjay case, supra, which, incidentally was called to our attention by plaintiff Atlantic, holds that while interest accruing on borrowed working capital until the contract was completed is an allowable item of cost under the Lucas Act, interest accruing after that date (which was July 22, 1943) is not allowable. We cannot agree with that conclusion since the Lucas Act itself provides that (Section 1) claimants may recover losses “incurred between September 16, 1940 and August 14, 1945.” Since we have held that interest on working capital was a necessary cost of performing these contracts plaintiffs are entitled to have taken into consideration interest incurred by Acme on working capital used in the performance of these contracts up to August 14, 1945, computed at the rate of six percent per annum, but not interest accruing thereafter. Accordingly we have included, in determining Acme’s net losses, $4,605.12 representing interest incurred up to August 14, 1945 on funds borrowed by Acme from Auto Finance and Atlantic and used in the performance of its war contracts.

Standing of Atlantia, as Acme’s assignee, to hri/ag suit wader the Lucas Act.

As security for the loans from Atlantic, Acme assigned to the Atlantic Corporation all moneys due or to become due under or by reason of its contracts and subcontracts for the fabrication of oil storage and settling tanks for the Maritime Commission. Defendant does not dispute the validity of the assignment under the 1940 amendment to the Assignment of Claims Act (54 Stat. 1029) but does urge that Acme’s Lucas Act claim, being a mere gratuity and not in existence at the time of the assignment, did not pass to Atlantic under the assignment. In support of its position defendant cites a case decided under the Dent Act, supra.
We note first that the case relied on by defendant arose under Section 5 of the Dent Act. Ickes v. Cuyuna Mining and Investment Co., 69 F. 2d 662, cert. den. 293 U. S. 561. Section 5 of the Dent Act was different in several material respects from the Lucas Act. As originally enacted in 1919 (40 Stat. 1272), it merely authorized the Secretary of the *497 Interior (and no one else) to make such adjustment and payments as lie should determine to be just and equitable with respect to the net losses suffered by any person, etc., in the production or preparation to produce certain scarce metals “in compliance with the request or demand of the Department of the Interior” and of other specified agencies of the United States, “to supply the urgent needs of the Nation in the prosecution of the war.” The second paragraph of Section 5 provided that the decisions of the Secretary as to what adjustments were just and equitable should be conclusive and final. The Secretary’s discretion in awarding relief was limited only in that he was required to find (a) that the expenditures made or obligations incurred by claimants were in good faith, (b) were for or upon property containing the specified scarce minerals in quantities of commercial importance, and (c) that the money was invested or obligations incurred during the statutory period to produce metals for the United States for the prosecution of the war. No profits were to be included in the award. The only review provided respecting a settlement so made, was by Congress itself. The section finally provided “that nothing in this section shall be construed to confer jurisdiction upon any court to entertain a suit against the United States.”
On November 23, 1921, Section 5 of the Dent Act was amended (42 Stat. 322) to provide relief not only for those persons who produced metals in compliance with a request or demand of a United States agency, but also for those persons who did so in response to “any personal, written, or published request, demand, solicitation or appeal” from any of the Government agencies mentioned in the Act. Production under the latter circumstances became known as “stimulated” production. The Secretary of the Interior was given authority to reconsider claims previously denied and to make further awards or awards for the first time as he deemed proper.
On February 13, 1929 the Dent Act (Section 5) was amended to provide that (45 Stat. 1166) any claimant who had filed a claim under Section 5 within the statutory period, might petition the Supreme Court of the District of Columbia to review the final decision of the Secretary of the In *498 terior upon any question of law which, “has arisen or may hereafter arise” in the adjustment, liquidation and payment of his claim, but “the decision of the Secretary of the Interior on all questions of fact shall be conclusive and not subject to review by any court.” The amendment also provided that the Secretary of the Interior should be designated as the defendant upon the filing of the petition.
In the Cuyuna Mining & Investment Co. case, supra, referred to by defendant, the Northern Minnesota Ore Company had filed a claim under the 1919 version of Section 5 of the Dent Act and had been awarded and paid a portion of its total claim. Following the 1921 amendment, an additional award was made on the basis of Northern’s application for reconsideration. In 1927, Northern went into receivership and by decree of court on October 30, 1928, all its property, real and personal, rights of action, and other assets, were transferred and assigned to Cuyuna Mining & Investment Company. Following the passages of the 1929 Act, Cuyuna, as owner of all the assets of Northern, brought an action against the Secretary of the Interior following his denial of Cuyuna’s claim under the 1929 amendment to Section 5 of the Dent Act. In holding that Cuyuna had no standing to sue, the court pointed out that Congress did not create a legal claim when it passed Section 5 of the Dent Act or when it enacted the two later amendments, quoting as follows from the opinion of Chief Justice Taft in Work v. United States ex rel. Rives, 267 U. S. 175:
It did not, as it did with the claims for supplies and services directly furnished the Government under the first and second sections of the Act, make the losses recoverable in a court, but expressly provided otherwise. It dealt with the subject with the utmost caution. It hedged the granting of the equitable gratuity with limitations to prevent the use of the statute for the recovery of doubtful or fraudulent claims or merely speculative losses. It vested the Secretary with power to reject all losses except as he was satisfied that they were just and equitable and it made his decision conclusive and final. Final against whom? Against the claimant, (p. 181)
The Circuit Court noted that the Bines decision was rendered prior to the 1929 amendment, but stated:
*499 * * * there is nothing in that act which in any way changes the character of the claims.
We think that the Lucas Act is more nearly like the first two sections of the Dent Act than it is like Section 5. The Lucas Act, like Sections 1 and 2 of the Dent Act makes losses recoverable in a court where the claimant is dissatisfied with the “adjustment, payment or compensation offered by the Secretary of War”, or “in the event that the Secretary of War shall fail or refuse to offer a satisfactory adjustment * * (Section 2 of Dent Act.) A reading of those sections and the decisions of this court under those sections, leaves no doubt but that Congress created a legal claim in favor of contractors similar to the rights enjoyed by contractors under Section 17 of the Contract Settlement Act of 1944.[9] In a number of instances suit was brought and recovery had by plaintiffs who were not the original contractors but who had acquired the assets of the contractor through foreclosure sale, merger, etc., i. e., by operation of law, including the right to sue under Sections 1 and 2 of the Dent Act. It is true that an assignee such as Atlantic would not have been entitled to sue under any of the provisions of the Dent Act, but this was because such an assignment was void under the then existing Assignment of Claims Act.[10] Hall v. Chandler, 289 F. 675, Goodman v. Niblack, 102 U. S. 556.
We have then, in the Lucas Act, as in Sections 1 and 2 of the Dent Act, a cause of action against the United States[11] arising out of a formally executed contract (insofar as the Lucas Act is concerned). Not only do we believe that it is immaterial that the cause of action did not exist at the time the assignment to Atlantic was made, but we think that denying Atlantic the right to appear as plaintiff in this *500 suit would be violative of one of the fundamental purposes of the 1940 amendment to the Assignment of Claims Act (54 Stat. 1029, 31 U. S. C. § 203). That Act was amended to make it easier for government contractors to secure financing for carrying out obligations to the Government to the end that government contracts might be speedily and effectively performed. U. S. v. Hadden, 192 F. 2d 327, General Casualty Co. of America v. Second National Bank of Houston, 178 F. 2d 679, Royal Indemnity Co. v. United States, 117 C. Cls. 736 (93 F. Supp. 891), Central National Bank of Richmond v. United States, 117 C. Cls. 389. Because of this amendment, Atlantic was induced to invest its money in the Maritime Commission contracts. If Acme had become entitled to additional funds from the Maritime Commission during the performance of its contracts or thereafter by virtue of an amendment without consideration entered into pursuant to the authority granted that Commission in Section 201 of the First War Powers Act (55 Stat. 839, 50 U. S. C. Sec. 611), we have no doubt that payments made pursuant to such modification would have been made by the Maritime Commission to Atlantic under the terms of its agreement with Acme. In fact the Assignment of Claims Act is specifically referred to in Title II, Section 3 of Executive Order 9001, issued pursuant to the First War Powers Act:
3. No claim against the United States arising under any purchase or contract made under the authority of the Act [Sec. 611] shall be assigned except in accordance with the Assignment of Claims Act, 1940 * * *.
We accordingly conclude that Atlantic, an assignee under an assignment valid within the meaning of the 1940 amendment to the Assignment of Claims Act of a contractor having a claim under the Lucas Act, is a proper party plaintiff in a suit for losses incurred on contracts covered by the assignment.

Total Net Loss Recoverable Under Lucas Act

On the basis of the whole record, we conclude that the amount of Acme’s net loss equitably recoverable under the Lucas Act is $28,483.60 (Finding 26). This amount represents Acme’s net loss on all contracts held by it under which *501 work, supplies, and services were furnished for the Government between September 16, 1940, and August 14, 1945.
Since we have concluded that Atlantic held a valid assignment from Acme under the Assignment of Claims Act for all amounts due under the Maritime Commission contracts, Atlantic is accordingly entitled to receive so much of the amount found equitably due Acme as will satisfy the outstanding debt to Atlantic. We have also found (Finding 27) that as of August 14, 1945, Acme’s debt to Atlantic was in excess of the amount of the sum of Acme’s net losses, and the proof indicates that Acme’s outstanding debt to Atlantic exceeds the amount that was due on August 14, 1945. It appears, therefore, that Atlantic is entitled to receive the entire amount of the net loss found to be equitably recoverable under the Lucas Act, i. e., $28,483.60.

Defendant's Counterclaim

Defendant has filed in Cause No. 48761 a counterclaim against plaintiff, Samuel Waxman, seeking to recover $11,194.12 by reason of certain taxes assessed by the Commissioner of Internal Eevenue. By certificates of assessment the Commissioner of Internal Eevenue during the period November 20,1945 to July 18, 1947, issued seventeen assessment certificates against Acme Iron Works and one assessment certificate against Samuel, Saul, Louis and Harry Waxman, doing business as the Acme Iron Works, in the total amount of $11,194.12 for withholding taxes, taxes under the Federal Insurance Contributions Act, and taxes under the Federal Unemployment Tax Act, plus penalties and interest thereon. A tabulation of the information shown in such assessment certificates is included in our finding No. 28.
The defendant is entitled to recover on its counterclaim against Waxman, but it appears that a portion of the amount included in the counterclaim has been recovered by the Government through foreclosure of its tax lien on Acme’s real estate and the record before the Court does not establish the amount of the taxes, penalties, and interest now due the Government.
We do not decide at this time the question whether or not defendant is entitled to offset against Atlantic’s recovery *502 herein the amount of any taxes still unpaid and owing to the United States by Acme and the Waxmans and that matter is reserved for such further proceedings before the Commissioner and this Court as may be necessary.
Accordingly, the case is remanded to the Commissioner for a determination and report as to the amount of taxes, penalties, and interest now due the Government by Samuel Waxman, doing business as Acme Iron Works. Entry of an order directing the Maritime Commission to settle the claim by making payment to Atlantic, and the entry of judgment for defendant on its counterclaim are accordingly suspended pending further proceedings before our Commissioner and the Court as indicated above.
In view of the foregoing, the petition of Samual Waxman, d/b/a Acme Iron Works (No. 48761) and the intervening petition of Samuel Waxman, etc. (No. 48859) are dismissed.
MaddeN, Judge,; Whitaker, Judge; Littletok, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel as follows:
1. Plaintiff, Samuel Waxman, at all times herein mentioned, was engaged in the business of iron fabrication under the firm name of Acme Iron Works and, under such name, he entered into the contracts here involved with the United States. Samuel Waxman had three sons, Saul, Louis, and Harry with whom he entered into a partnership which continued to do business under the name of Acme Iron Works. Acme Iron Works, either as a proprietorship or as a partnership, will hereinafter be referred to as Acme.
Plaintiff, Atlantic Corporation, is a corporation organized and existing under the laws of the Commonwealth of Massachusetts and is a financing institution.
2. On July 27,1948, Samuel Waxman filed his petition in Cause No. 48761 to recover losses alleged to have been sustained between September 16, 1940, and August 14, 1945, in the performance of contracts entered into with the United States. His suit is founded upon the Lucas Act (60 Stat. *503 902). On July 28,1948, Atlantic Corporation, as assignee of Samuel Waxman, doing business as Acme Iron Works, filed its petition in Cause No. 48766 to recover, under the provisions of the Lucas Act, losses sustained by Acme Iron Works in the performance of its said contracts with the United States. On August 2, 1948, Atlantic Corporation filed a similar suit in the District Court of the United States for the District of Columbia, and on September 8, 1948, the District Court entered an order transferring that action to this Court wherein it was docketed as Cause No. 48859. On November 2, 1948, by leave of the Court, Samuel Waxman filed his petition in intervention in Cause No. 48859.
Since the three suits are on the identical cause of action, they were consolidated for trial.
3. During the period between September 16, 1940, and August 14, 1945, Acme performed a number of purchase-order prime contracts and subcontracts for the United States Maritime Commission for work in connection with the prosecution of the war. The Maritime Commission is an agency of the United States which, prior to August 14, 1945, was authorized to enter into contracts and amendments or modifications of contracts under Section 201 of the First War Powers Act.
4. Acme assigned to Atlantic Corporation all moneys due or to become due under or by reason of the aforesaid contracts and subcontracts. The Atlantic Corporation filed notice of said assignments, together with true copies thereof, with the Maritime Commission and the General Accounting Office.
5. No action has been taken with respect to said contracts under the Renegotiation Act, the Contract Settlement Act of 1944, or similar legislation; no relief has been granted to the Acme Iron Works or its assignee under Section 201 of the First War Powers Act of 1941, or otherwise; no losses under the aforesaid contracts or subcontracts have affected the computation of the amount of the excessive profits determined in any renegotiation or order; no relief is proposed to be granted by any other department or agency of the United States under Public Law No. 657, approved August 21,1946 (60 Stat. 902).
*504 6. In addition to the work done on the contracts and subcontracts for the Maritime Commission, Acme had contracts aggregating $4,025 with other Government agencies during the period between May 1, 1943, and August 14, 1945, and, in addition, Acme performed some non-Government work during that period.
7. Samuel Waxman is an elderly man who started his working career as a blacksmith. In 1917, he established himself as a manufacturer of small iron products under the name “Acme Iron Works” in Boxbury, Massachusetts. In 1937, his son, Saul, who had had some education and experience in engineering, became associated with his father in the business. About the year 1942, Samuel Waxman entered into an informal partnership agreement with his three sons pursuant to which it was agreed that the father owned 50 percent of the business and each of the sons owned 16% percent thereof. The agreement was never reduced to writing.
The contracts with the Maritime Commission were signed “Acme Iron Works by Samuel Waxman,” and the documents and correspondence pertaining to the contracts were signed for the Acme Iron Works either by the father or by one of his sons. Saul Waxman assisted his father in the performance of the Maritime Commission contracts, and Louis Waxman assisted in their performance during the period after April 1, 1944. Harry, the youngest son, was inducted into the armed services of the United States and continued in the Army throughout the period Acme worked on the contracts.
8. The major portion of the purchase orders which Acme entered into with the Maritime Commission were for the fabrication of oil storage and settling tanks to be installed in pairs on ships and designated as ship sets. Acme was required to furnish both the materials and labor for the completion of the work in accordance with the specifications. The first of the purchase orders was executed about May 1, 1943, and the last was executed on June 29,1945. After the tanks were fabricated by Acme, they were shipped on Government bills of lading to the Bethlehem-Fairchild Shipyard, Baltimore, Maryland; California Shipbuilding Company, *505 Terminal Island, California, and Permanente Metals, Portland, Oregon.
9. On June 29, 1945, Acme filed with the Maritime Commission a written request for relief in the way of additional compensation on account of losses resulting from higher costs in the performance of the contracts than had been anticipated. No final action had been taken on the request when Acme’s contracts were terminated on August 14, 1945. On February 7, 1947, Acme submitted to Maritime Commission a written claim for the payment of losses alleged to have been sustained under the contracts. The claim was denied by the Maritime Commission and Acme was notified of that action by letter dated February 2, 1948. On February 9, 1948, Acme petitioned the Commission for reconsideration of its decision, but by letter of February 24, 1948, the Commission affirmed its denial of the claim.
10. The gross receipts of Acme under its contracts with the Maritime Commission were $270,323.59. As will hereinafter appear, Acme refunded $11,000 to the Commission, thereby reducing the net receipts under the contracts to the sum of $259,323.59.
The costs incurred by Acme in the performance of the contracts exceeded its receipts. Although the evidence is not sufficient to establish exactly what caused all of the loss sustained, the major portion of such loss was due to the causes described in succeeding findings.
11. Although Acme had had no previous experience in the manufacture of the tanks ordered by the Maritime Commission, it had had considerable experience in the iron fabricating business. Acme started production on the contracts with one shift of employees who worked eight to nine hours per day, and Acme was able to maintain the contract delivery schedule on that basis. Thereafter, the defendant requested Acme to take additional orders and to employ two shifts instead of one so that it could make deliveries ahead of schedule. This request was made because other contractors had failed to meet the Government’s schedule for the delivery of the tanks. At first, Acme protested that it was producing tanks as rapidly as possible, but later it agreed *506 to use two shifts instead of one and to employ the men ten hours on each shift.
The union rules in effect at that time provided that the night shift employed in industry would work seven hours for eight hours’ pay and would receive overtime for any work after seven hours. A representative of the Maritime Commission promised Acme that it would receive an increase in the contract price to compensate for the extra cost of the night shift, but the increase was never made.
Work in the iron fabricating industry is arduous, and the productivity of the men declines after the first five or six hours, so that the efficiency and productivity of the men during the overtime periods paid for by Acme were less than during normal working hours.
12. In the beginning, the specifications of the Maritime Commission contracts provided that the tanks were to be welded by a process known as staggered welding and were to be flushed with oil before shipment. Within a short time after work began, however, the defendant made a change in the specifications which required Acme to seal-weld all the tanks, and the new method was about 50 percent more expensive than the original method. The seal-welding was required because the defendant, at the same time, issued a change order which directed Acme to remove the mill scale from the tanks by immersing them in an acid bath or subjecting them to a sandblasting process. Acme had had no prior experience in the removal of mill scale and possessed no equipment for treating the tanks with acid or sandblasting them. At first, Acme tried to remove the scale with acid, but this was found to be an expensive process and was not feasible in Acme’s plant because the acid burned out the pumps used for pumping the acid from the storage tanks. Thereupon, Acme built a room for sandblasting and discovered that, while this method was more expensive than the acid treatment and took a longer time, it was a more practical one. Acme submitted an estimate of the cost of sandblasting based on a slight amount of work done by a workman who was then employed in the firm. Sandblasting is unpleasant work, and the workman referred to quit after about a month’s work as a sandblaster. Acme was unable to find *507 another workman as skillful as the man who left and finally had to resort to the use of two men instead of one in the sandblasting room. The defendant issued an extra under which Acme was paid additional compensation for the sandblasting at the rate quoted in Acme’s estimate. As stated, however, the estimate was based on the work performed by the workman first employed to do the sandblasting, and the actual cost considerably exceeded Acme’s estimate.
13. Acme’s costs were increased because of the difficulties it encountered in obtaining an adequate supply of skilled labor during the wartime period. Prior to the time the Maritime Commission contracts were awarded to Acme, it had employed a force of from ten to sixteen men. After the contracts were promised to Acme, it took no other orders and held the men idle in readiness for work on such war contracts. However, there was a considerable delay before the purchase orders were actually issued, and Acme was compelled to release all of its employees except one. The men promised to return when work on the Government contracts started, but in the meantime they were frozen in their new jobs because of wartime restrictions and were unable to do so. In order to efficiently perform the contracts, Acme needed skilled labor, such as ironworkers, arc welders, and sandblasters. Although it appealed to and received some assistance from the local War Labor Board and other Government agencies, Acme was never able to obtain a sufficient number of skilled workmen for efficient production.
14. Acme also incurred additional costs in the procurement of materials needed for the fabrication of the tanks because of the war situation. The principal materials used were steel plate and steel bars, and such material was ordered from the steel mills that normally supplied these products. On account of wartime scarcities and restrictions, however, the mills were frequently unable to deliver the material when needed. As a result, Acme had to cancel about 25 percent of the orders given to the mills and to purchase the steel from warehouses and other local distributors. The cost of the steel purchased from local sources was about 50 percent higher than if it had been furnished by the mills. The warehouse prices were about 30 percent higher than mill *508 prices. The steel obtained from the mills was made to order in the sizes and shapes required by Acme, but the steel obtained from local sources came only in stock sizes which had to be cut and shaped to meet Acme’s needs. This resulted in a larger percentage of scrap and a higher cost of fabrication.
15. The first eleven ship sets were not inspected by the Government before shipment, but thereafter all the tanks were inspected and approved by the defendant’s inspector before they left Acme’s plant. The method of inspection followed by the Government resulted in higher costs than had been anticipated. Although the tanks were in continuous production, the inspector advised Acme that he would spend only two days a week at the plant and requested that the tanks be lined up for his inspection during the latter part of the week. He also insisted that a foreman and four skilled workmen accompany him on the inspection for the purpose of correcting any defects pointed out by him. During the 8-hour inspection tour on each of the two days, Acme’s workmen spent only about an hour and a half per day in correcting the defects in the tanks. The remainder of their time was spent in waiting for the inspector to point out and mark any defects found by him.
16. As stated in the preceding finding, all but eleven of the ship sets were inspected and approved by the defendant at Acme’s plant before the tanks were shipped on Government bills of lading to the three shipyards designated by the defendant. After a number of the tanks had been shipped, Acme was advised by the East Coast Eegional Office of the Maritime Commission that the shipyards had complained that some of the tanks shipped by Acme were in need of repairs because of broken ladder rungs, missing manhole covers, and dirt in the tanks. Saul and Louis Waxman thereupon made a trip to the Bethlehem-Fairchild Shipyard, Baltimore, Maryland, the nearest of the three consignees, for the purpose of finding out why the tanks were in need of repairs. They found a number of the tanks lying uncovered in the open on soft dirt with the manhole covers on the ground beside them. Some of the ladder rungs had been broken and dirt had entered the tanks, because the manhole covers had been removed. Before the tanks had been *509 shipped from Acme’s plant, the manhole covers had been gasketed and bolted to the front of the tanks and the two flanges on the top of each tank had been fitted with corks to keep them airtight. However, when the partners inspected the tanks at the shipyard, they found that the corks were missing and that the manhole covers had been removed and laid on the ground.
The damaged tanks at the Baltimore shipyard were returned to Acme and repaired in its plant. Since the West Coast shipyards were far distant from Acme’s plant, the Maritime Commission directed those shipyards to repair the tanks in their yards.
On or about August 14,1945, when Acme’s contracts were terminated, the Maritime Commission submitted a bill in the sum of $27,194.80 to Acme for the cost of the repairs made on the West Coast. At that time, the Maritime Commission was indebted to Acme in the amount of $21,925.59 for work on the contracts and for termination expenses, but the defendant refused to pay Acme any portion of that amount until the repair bill was paid. When the bill was presented, Acme was in financial straits. It owed more than $40,000 on loans obtained to perform the contract, and interest was accruing on that indebtedness at the rate of two percent per month. Acme refused to pay any part of the claim on the ground that it was not responsible for the damage to the tanks. The dispute was not settled until April 24,1947, when Louis Waxman and the President of the Atlantic Corporation called on representatives of the Maritime Commission in Washington, D. C., in an effort to obtain payment of the balance due Acme. At that time, they were informed by representatives of the Maritime Commission that, unless Acme made a settlement of the repair bill, payment of the amount due Acme by the defendant would probably be held up for years. Under these circumstances, Acme and Atlantic compromised the defendant’s claim for $11,000. The $11,000 was paid by a check of the Atlantic Corporation, and thereupon the defendant paid Acme the balance of $21,925.59 due on the contracts and for termination expenses.
There is no evidence that the tanks were not made by Acme in accordance with the defendant’s specifications. While *510 there is some evidence to the contrary, the greater weight of the evidence establishes that the damage to the tanks and the repairs necessitated thereby were not due to the fault or negligence of Acme.
17. Acme’s costs were considerably increased because it lacked the working capital needed to perform the contracts and because it had to borrow the necessary funds from a finance company and pay high interest rates on the loans obtained.
When the first of the Maritime Commission orders was awarded to it, Acme owned machinery and equipment worth about $18,500, but it had no capital with which to finance the current costs of manufacturing operations or to acquire the additional equipment and machinery needed to manufacture the tanks for the Government. Acme first endeavored to borrow the necessary funds from a number of commercial banks, but these efforts were not successful. Acme did succeed in borrowing limited amounts from Auto Insurance Finance Corporation at an agreed interest of approximately six percent per annum, but because of Acme’s larger requirements, it was obliged to find some other source from which it could secure funds in much greater amounts. It accordingly applied to the Eeconstruction Finance Corporation which, at that time, was making loans through participating banks under an arrangement by which EFC approved the loan and guaranteed 75 percent thereof to the participating bank, which advanced the funds to the borrower. One or two applications were made to the EFC prior to December 1, 1943, but these did not result in any loan approvals. On January 5, 1944, however, the participating bank was notified by the EFC that it had approved a loan application, which Acme had filed on December 1,1943, in the amount of $35,000. After it had received the papers from the EFC, the participating bank refused to execute them and the loan commitment was canceled on February 21,1944. Acme then requested the EFC to make a direct loan, and after the partners had telephoned to and called at the Boston office of the EFC on several occasions, they concluded that the loan would not be approved. In the meantime, Acme, which was badly in need of funds for the purposes stated above, had *511 applied to and obtained a loan from the Atlantic Corporation, a private finance company in Boston, Massachusetts. On March 4, 1944, Acme notified the RFC that it had succeeded in obtaining a loan from a finance company and was, therefore, withdrawing the loan application made to that agency.
The Atlantic Corporation advanced considerable sums of money to Acme from time to time during the performance of the contracts and charged interest on the loans at the rate of three percent for the first month and two percent per month for each month thereafter. There is no law in Massachusetts affecting the rate of interest that may be charged on loans in excess of $1,000 where the loan is evidenced by a written obligation. Commercial banks in Boston commonly lend money at rates of interest which vary from 1 y2 percent per annum on commercial paper purchased by the banks to 12 percent per annum on loans secured by chattel mortgages. Finance companies in the Boston area usually charge interest at the rate of from one percent to three percent per month on loans made by them. The Atlantic Corporation usually charges an interest rate of two percent per month on its loans but in some instances charges higher rates. In a number of instances, referees in bankruptcy in Boston have approved loans obtained from finance companies, whose loans were secured by a lien against the assets of the bankrupt and bore interest at the rate of two percent per month. The Atlantic Corporation has made such loans.
18. After Acme’s claim of February 2,1947, had been filed with the Maritime Commission, it sent one of its accountants to make an audit of the claim. The accountant made his audit during the period from May to September 1947. Within a short time after his arrival, he discovered that Acme’s books and records were grossly incomplete and had been kept in such an inaccurate manner that it was impossible to use them for the purpose of determining Acme’s costs of performing the contracts.
When it began manufacturing tanks for the defendant, Acme employed a girl to keep the books, but it became necessary to discharge her when it was found that she was not a bookkeeper and had been making erroneous entries. Another *512 girl was employed, but the evidence reflects that she had little, if any more, knowledge of proper bookkeeping practices than her predecessor. Before the audit was made by the Maritime Commission, some of Acme’s records were destroyed in a small fire; some were scattered and destroyed in part by a burglar and by vandals, and some were damaged and rendered illegible by rain, which entered the building through a leaky flashing around a window near the point where such records were stored.
The Maritime Commission auditor reported to his superiors that, while there was no indication of an attempt to perpetrate fraud by improper bookkeeping, Acme’s books contained numerous incorrect entries, unexplained journal entries, and mathematical errors. Having determined that Acme’s books could not be relied on for the purpose of the audit, he developed the costs applicable to the Maritime Commission contracts on a functional cost basis, allowing only such costs as were evidenced by job cost cards, tax reports, and accounts payable invoices. He and the partners made extensive efforts to obtain copies of invoices from vendors who had supplied material or services to Acme and, with a few exceptions, duplicate copies were secured. He allocated the costs applicable to the Maritime Commission contracts separately from those applicable to other work and reported the costs, which he found to be supported by original records or other reliable data and also the unsupported costs, which consisted of additional costs claimed by the partners. He found and it was a fact that he could not, from the available records, break down Acme’s costs into separate costs for each of the Maritime Commission purchase orders. He determined that in the performance of the contracts sued upon, Acme had incurred a total cost of $258,681.29, including $15,435.28 applicable to the repair of tanks. Under the heading of unsupported costs, he reported a total of $130,-425.16. In addition, his audit listed cost items totaling $23,102.49 for costs incurred subsequent to August 14, 1945.
The defendant’s auditor understated Acme’s costs in several respects, because he did not find adequate records to support expenses claimed by the partners.
*513 19. On January 9, 1948, the Committee on Claims of the Maritime Commission considered the claim, including the amendments thereto, which had been filed by Acme and the report of the Commission’s auditor. In its report, which is in evidence as Plaintiff’s Exhibit 5 and made a part hereof, the Committee found that the adjusted audited loss sustained by Acme in performance of the Maritime Commission contracts amounted to $38,314.37. However, the Committee held that no portion of the loss was allowable under the Lucas Act, because Acme’s claim failed to comply with the requirements of that statute and Executive Order 9786 in the following respects :
(1) The claim failed to show the cost of performance and the loss claimed under each Government contract as required by Paragraph 202b of the Executive order;
(2) the claim did not contain a statement of the contract price, the cost of performance, and profit or loss on each contract and subcontract identified by agency number and date as required by Paragraph 202c of the Executive order;
(3) the claim did not contain a statement of any other relief sought with respect to losses claimed as required by Paragraph 202g of the Executive order;
(4) the claim failed to comply with Paragraph 202j of Executive Order 9786 in that it did not contain a detailed statement showing the facts and circumstances regarding each loss claimed;
(5) the claim did not sufficiently comply with the requirements of Paragraph 202k of the Executive order, which requires a showing that the loss occurred through no fault or negligence of the claimant;
(6) the claim failed to state the amount by which the loss reduced income or excess profits taxes of Acme for any taxable year as required by Paragraph 202m of the order;
(7) the affidavit to the claim was signed only by Samuel Waxman and not by two responsible officers of Acme as required by Paragraph 202n of the order;
(8) Acme’s net loss on all.contracts and subcontracts with the Government could not be determined, and therefore the claim did not comply with the requirements of Section 2 (a) of the Lucas Act.
*514 In view of its findings, the Board recommended that the claim be denied in toto on the grounds that (a) Acme had failed to show a net loss on its contracts and subcontracts with the Government during the period between September 16, 1940, and August 14, 1945; (b) that the Committee was unable to find that relief would have been granted under the First War Powers Act if final action had been taken by the Commission before August 14, 1945; (c) that the Committee was unable to find that the claim was equitable under all the circumstances as required by Article 304 of Executive Order 9786, and (d) that the claim failed to comply with the provisions of Paragraphs 202 and 205 of the Executive order.
The recommendations of the Committee were approved by the Maritime Commission, and Acme was so notified by letter of February 2,1948.
Although the claim filed by Acme with the Maritime Commission failed to comply in several technical respects with the exact requirements of the Executive Order, the evidence is sufficient to establish that the claim filed substantially met the requirements of the regulations. Acme did not have and was unable, after considerable effort, to obtain some of the information called for by the regulations and, therefore, submitted the best information it had available. Acme’s failure to comply with the provisions of the regulations in the respects referred to in the report of the Committee on Claims of the Maritime Commission was not sufficient to prevent that agency from making a reasonably accurate determination of the amount of Acme’s net loss on all Government contracts performed during the statutory period.
20. During its performance of the Maritime Commission contracts, Acme did not maintain separate cost records for each of the purchase orders, nor separate cost records for Government contracts as distinguished from work for private customers. The record establishes, however, that during the period between May 1, 1943, and August 14, 1945, Acme incurred, without fault or negligence on its part, the following costs in the performance of the Maritime Commission contracts:
*515 Direct labor_$88,381.70
Indirect labor- 7,624.03
Materials- 72,781.11
Direct charges_ 28,281.63
Indirect expense_ 27,445.61
Bank charges- 126.22
Depreciation_ 3,848.92
Insurance_ 2,752. 04
Taxes_ 3,942.64
Travel_ 7,268.00
Total- 242,452.80
The foregoing statement does not include any costs or allowances for interest, partners’ salaries, rent, or expenses incurred after August 14,1945. The facts pertinent to these items are set out in succeeding findings:
INTEREST
21. The facts regarding Acme’s claim with respect to interest on money borrowed for performing the contracts have been recited in part in finding 17. Of the total amount of interest incurred by Acme on loans advanced between the date of the first Maritime Commission contract and August 14, 1945, and which is allocable to the Maritime Commission contracts, the sum of $13,127.77 was incurred on loans made by Atlantic and $1,248.97 was incurred on loans made by the Auto Insurance Finance Corporation. The total interest thus incurred in the amount of $14,376.74 was reported in the audit of the Maritime Commission’s auditor under the heading of “Supported Costs Applicable to the Maritime Commission Contracts.”
The plaintiffs in these actions are also claiming that an additional sum of $34,717.18 should be added to Acme’s costa for interest that accrued after August 14,1945. Some, additional loans were made by Atlantic after August 14, 1945, and the evidence does not clearly establish che amount of interest, applicable to the Maritime Commission contracts, that accrued after August 14, 1945.
The interest of $14,376.74 reported by the accountant of the Maritime Commission consisted of an item of $1,071.55 applicable to the repair of the tanks, and an item of $13,- *516 305.19 for interest applicable to other work performed on the purchase orders.
The Committee on Claims of the Maritime Commission did not include in its computation of the net loss any costs that were attributable to the repair of tanks. With respect to the interest of $13,305.19 included in the auditor’s report, the Committee recommended as follows:
Column 1 includes an item of “Interest” in the amount of $13,305.19. The interest rate paid by Acme, in some instances, was 3% for the first month, and 2% for each month thereafter. The Committee on Claims is of the opinion that interest in Column 1 in excess of 6% per annum (the legal rate in Massachusetts, in the absence of agreement or provision of law) is excessive, and should be disallowed as an unreasonable and unnecessary cost of performance under Paragraph 101.7 of Executive Order 9786, issued pursuant to Public Law 657 — 79th Congress. That paragraph defines “cost of performance” as “reasonable and necessary cost.” Interest in Column 1 in excess of 6%, which was incurred prior to August 14,1945, totals $9,771.62, as shown in Column 8.
The total amount of interest that was incurred by Acme and properly allocable to the Maritime Commission contracts to August 14,1945, was in the sum of $14,376.74. This interest charge was incurred on funds borrowed by Acme for the performance of the Maritime Commission contracts. The interest paid on the Auto Insurance Finance Corporation loans prior to August 14, 1945 in the amount of $1,248.97 was at the rate of six percent per annum. Had Acme paid interest on its loans from Atlantic at the rate of six percent per annum, it would have paid Atlantic approximately $3,356.15 prior to August 14, 1945, and the total amount disbursed for interest allocable to the Maritime Commission Contracts and repair of tanks to that date would have been $4,605.12.
PARTNERS’ SALARIES
22. During the performance of the Maritime Commission contracts, it was agreed among the partners of Acme that the working partners, i. e., Samuel, Saul, and Louis would receive salaries for their supervisory services. However, the *517 evidence is vague and conflicting with respect to the amount of the salaries the three partners were to have been paid. In the original claim filed with the Maritime Commission, Acme claimed salaries of $10,000 per year for Samuel Waxman, $8,000 per year each for Saul and Louis Waxman, and none for Harry Waxman, who was in the Army during the time the contracts were performed. In the amendment to the claim, however, Acme claimed salaries of $18,000 per year for each of the four partners. During the trial of these cases, two of the partners testified that it was agreed that Samuel, Saul, and Louis Waxman would receive salaries of $13,000 per annum, but that Harry Waxman was to receive no salary, because he was not a working partner. In these suits, plaintiffs claim that the three working partners were to be paid a salary of $13,000 each per annum.
Although the evidence is not sufficient to establish the terms of the agreement as to the salaries the working partners were to receive, the financial condition of the business was such that the salaries actually paid were $50 per week to Samuel Waxman, and $40 each per week to Saul and Louis Waxman. Samuel and Saul Waxman were operating the Acme Iron Works at the time the Maritime Commission contracts were entered into, but Louis Waxman did not begin working actively in the business until about April 1,1944. On the basis of the salaries received by the three working partners during the performance of the contracts, the sum of $11,521.30 is applicable to such contracts.
The modest salaries which the three partners received did not represent fair and reasonable compensation for the value of their services in the performance of the Maritime Commission contracts. During the same time such salaries were being paid to the partners, some of Acme’s skilled employees were earning as much as $140 to $150 per week, including overtime. Samuel Waxman acted as general manager of the firm; Saul Waxman was production manager, and Louis Waxman handled the administrative affairs of the business. Aside from foremen in the shop, they provided all the managerial and supervisory services which Acme had available for the production of the tanks for the Government. *518 Before tlie contracts involved here were entered into, Samuel and Saul Waxman had generally worked the standard 40-hour week, but during the performance of the contracts the three partners worked an average of fourteen hours a day on weekdays and they also worked on most Sundays. The Sunday work was necessary in order to lay out the work so that there would be no delay when the workmen returned each Monday morning.
With respect to the item of partners’ salaries, the Committee on Claims of the Maritime Commission stated in its report as follows:
The item of “Salaries” in Column 3 is based on an annual sum of $13,000 for each of four partners, or a total of $89,530.73, applicable to Commission contracts. The original claim had been based on salaries of $10,000 per annum for Samuel Waxman, $8,000 per annum each for Saul and Louis Waxman, and nothing for Harry Waxman. He was in the armed services during the entire period of performance of Commission contracts, and no reason appears to this Committee for the allowance of any amount for him on this claim. The claim for the increase in partners’ salaries in the revised claim is unexplained. Acme’s books reflect no partners’ salaries, and none were actually paid. In view of the volume of sales and the quality of the work produced under the contracts, it is the opinion of this Committee that salaries in excess of $7,500 per annum for Samuel Waxman, from May 1, 1943 (date of first Commission contract), to August 14, 1945 (date work ceased under Commission contracts), and $6,000 per annum for Saul Waxman from May 1, 1943, to August 14, 1945, and $6,000 per annum for Louis Waxman, from April 1944 (when he joined the partnership), to August 14, 1945, would be excessive compensation for partners, under Executive Order 9786, paragraph 101.7b. Salaries at such rates total the following amounts:
$1,125.00 monthly for 27% months-$30,937. 50
$500.00 monthly for 16% months- 8,250.00
Total_ 39,187.50
85.9% applicable to Commission contracts_ 33,662.07
The claim of $89,530.73 for salaries, reduced by 62.4017%, totals $33,662.07. Applying the same percentage of 62.4017 to the sum of $4,792.75 for salaries allocable to repair work, there remains in costs the sum of $1,801.99 (37.5983%) for salaries so allocable.
*519 Reasonable compensation for the managerial and supervisory services contributed by tbe three partners to the performance of the contracts amounts to the sums of $7,500 per annum for Samuel Waxman from May 1,1943 to August 14, 1945; $6,000 per annum for Saul Waxman from May 1, 1943 to August 14, 1945, and $6,000 per annum for Louis Waxman from April 1, 1944 to August 14, 1945. The portion of such salaries that are properly allocable to the Maritime Commission contracts amounts to the sum of $33,788.96. Salaries in not less than the amounts stated would have been paid to the three partners during the time the contracts were performed had Acme’s income been sufficient to permit the payment of such salaries.
RENT
23. The Acme Iron Works occupied an area of 26,000 square feet of corner property, which was located in Rox-bury, Massachusetts. The location was some distance from the nearest railroad siding, so that both raw materials and finished products had to be transported by truck to and from the premises. Improvements on the property included one large wooden building, 100' x 50', one stone building, 37' x 37', one two-story brick building, 25' x 25', and a series of wooden structures, 170' x 30'. The open area of the property contained approximately 13,900 square feet. The property was acquired in August 1942 by Samuel Waxman as agent for his wife, Bertha Waxman, at a tax sale held by the City of Boston, Massachusetts, for a consideration of $4,800.
During its occupancy of the premises, Acme altered and strengthened the large wooden building by building new foundations and cement-block walls under the roof to replace the wooden siding. The cost of these improvements was approximately $9,000. Acme also installed a new heating system at a cost of about $2,800. In order to manufacture the tanks for the Maritime Commission, it became necessary for Acme to purchase and install cranes and hoists, and to lay concrete bases and erect suitable structures to support these facilities.
*520 Although no rent was actually paid to Bertha Waxman, plaintiffs claim that Acme agreed to pay Bertha Waxman a rental of $1,800 per month; that Acme also agreed to pay the real estate taxes on the property, and that a proportionate share of this rental should be allocated to the costs of performing the Maritime Commission contracts.
The partnership filed its Federal income tax returns on the accrual basis, and its tax return for the fiscal year beginning April 1, 1944, and ending January 31, 1945, is in evidence as defendant’s exhibit 5 and is made a part hereof. The tax return and a journal entry in Acme’s books show that rent accrued to Bertha Waxman at the rate of $200 per month. In addition to the monthly rent of $200, Acme agreed to and did pay the real estate taxes on the leased property. On the basis of the accrued rental of $200 per month and the real estate taxes paid during the performance of the contracts, the sum of $5,816.45 is properly allocable to the Maritime Commission contracts.
COSTS INCURRED AFTER AUGUST 14, 1945
24. Prior to August 14,1945, Acme ordered some steel for use on the Maritime Commission contracts. The steel was not delivered "until after the contracts were terminated, but the vendor refused to cancel the order because the steel had been especially manufactured for Acme’s use. In the negotiations for settlement of the contracts, the Maritime Commission appraised the steel as scrap at a value of $1,157.07. The defendant later sold part of the steel for $398.43 and allowed Acme a credit of $758.64 for the difference. After allowance for the credit, Acme’s net cost for the steel amounted to $1,650.11.
OTHER GOVERNMENT CONTRACTS
25. As stated in finding 6, Acme performed contracts for agencies of the United States other than the Maritime Commission during the period from May 1, 1943 to August 14, 1945. Aside from the contracts performed for the Maritime Commission, the only contracts which Acme had with Gov- *521 eminent agencies between September 16, 1940, and August 14, 1945, were two or three purchase orders performed by Acme for the Army and the Navy. The total consideration paid to Acme on such other contracts aggregated $4,025. The Maritime Commission’s auditor found that on a portion of such contracts, for which the consideration paid Acme aggregated $2,000, Acme sustained a loss. The evidence does not establish whether a profit or a loss was sustained on the remaining contracts, in which the total consideration paid Acme amounted to $2,025, but it is a reasonable conclusion from the record as a whole that Acme’s profits on all Government contracts, excluding the Maritime Commission contracts, did not exceed the sum of $506.25.
TOTAL NET LOSS
26. Actual expenses incurred by Acme (including a reasonable allowance for partner’s salaries, rent, and interest incurred prior to August 14, 1945), and total reimbursement received for the performance of the Maritime Commission contracts, together with net profit realized on other Government contracts, is as follows:
Operating expense (Fdg. 20)-$242,452.80
Partners’ salaries (Fdg. 22)_ 33, 788.96
Bent (Fdg. 23)_ 5,816.45
Loss on steel purchased and scrapped (Fdg. 24)- 1, 650.11
Interest on loans to Aug. 14,1945 (Fdg. 21)_$14,376.74
Less: Interest in excess of interest at 6% per annum_ 9,771. 62
- 4,605.12
Total_ 288,313.44
Total payments received (Fdg. 10)- 259,323.59
Total excess costs on M. C. contracts- 28,989.85
Less: Estimated, profit on other Government contracts (Fdg. 25)_ 506.25
Net Loss on All Contracts_ $28, 483. 60
The amount of Acme’s net loss on all contracts held by it under which work, supplies, and services were furnished for the Government between September 16, 1940, and August 14, 1945, amounted to the sum of $28,483.60. This loss was incurred without Acme’s fault or negligence.
*522 acme’s INDEBTEDNESS TO ATLANTIC
27. As of August 14,1945, Acme was indebted to Atlantic in the sum of $42,118.84 on loans obtained for the performance of the contracts involved here. This indebtedness consisted of principal in the sum of $28,991.07 and interest in the sum of $13,127.77.
28. The defendant asserts no counterclaim against the Atlantic Corporation, but on April 5, 1950, the defendant filed in Cause No. 48761 a counterclaim against the plaintiff, Samuel Waxman, seeking to recover $11,194.12 by reason of certain taxes assessed by the Commissioner of Internal Revenue. By certificates of assessment, which are in evidence as defendant’s exhibits 8 to 24 inclusive, the Commissioner of Internal Revenue during the period November 20, 1945, to July 18,1947, issued seventeen assessment certificates against Acme Iron Works and one assessment certificate against Samuel, Saul, Louis, and Harry Waxman, doing business as the Acme Iron Works, in the total amount of $11,194.12 for withholding taxes, taxes under the Federal Insurance Contributions Act, and taxes under the Federal Unemployment Tax Act, plus penalties and interest. The following is a tabulation of the information shown in such assessment certificates:

*523

*524

*525 29. All of such tax assessments were issued after August 14,1945, for taxable periods beginning with the second quarter of 1945. A portion of the amount included in defendant’s counterclaim was recovered by the Government in the foreclosure of its tax lien on Acme’s real estate, but the evidence does not establish what portion of the assessments were satisfied from the funds realized in the foreclosure, nor the amount of the taxes, penalties and interest now due the Government.
CONCLUSION OF LAW
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the Court concludes as a matter of law that the amount equitably due under the claim involved here is the sum of $28,483.60 and that Atlantic Corporation is entitled to have an order entered directing the Maritime Administration, successor to the Maritime Commission, to settle the claim by making payment to Atlantic in that amount and that plaintiff Samuel Waxman, doing business as Acme Iron Works, is not entitled to recover, and his original petition (No. 48761) and his intervening petition (No. 48859) are therefore dismissed. The Court further concludes that the defendant is entitled to recover on its counterclaim against Samuel Waxman, doing business as Acme Iron Works, the amount of the taxes, penalties, and interest now due the United States.
The entry of an order directing the Maritime Administration to settle the claim by making payment to Atlantic and the entry of judgment for defendant on its counterclaim are suspended pending further proceedings before the Commissioner and this Court concerning the amount of taxes, penalties and interest now due the Government from Samuel Wax-man, doing business as Acme Iron Works, and defendant’s right to offset against Atlantic’s recovery herein the amount of such taxes, penalties and interest found to be due the United States from Waxman, doing business as Acme Iron Works, and the filing of a report by the Commissioner as directed in this opinion.

 Cause No. 48761 was filed by Samuel Waxman, doing business as Acme Iron Works. Plaintiff in that cause will be referred to as “Acme.” Cause No. 48766 was filed in this court by Atlantic Corporation, as assignee of Samuel Waxman, doing business as Acme Iron Works. Cause No. 48859 is a similar suit which had been filed by Atlantic (as assignee) in the District Court of the United States for the District of Columbia and which, on order of that court, was transferred to this court. Petitioner in the last two mentioned causes will be referred to as “Atlantic”. On November 2, 1948, by leave of this court, Samuel Waxman filed his petition in intervention in Atlantic’s cause No. 48859.

 Public Law 657, 79th Cong., 2nd Sess., Ch. 864, 60 Stat. 902, as amended by Section 37 of Public Law 773, 80th Cong., 2nd Sess., 41 U. S. C. § 106 Note.

 Samuel Waxman, doing business as Acme Iron Works, v. The United States, 112 C. Cls. 281; Atlantic Corporation as Assignee of Samuel Waxman d/b/a Acme Iron Works v. The United States, 112 C. Cls. 297.

 See Meister v. United States, 106 F. Supp. 292 In which the Government showed at the trial of the case that plaintiff claiming under the Lucas Act had failed to fully and timely reveal to the Department concerned all of their profits and losses on all war contracts.

 Details relative to the causes of Acme’s losses, other than its loss on the repair of tanks, are contained in our findings 11, 12, 13, 14, 17 and 18. In general they consisted of the necessity of paying overtime rates and night shift rates, loss of productivity of workmen after the first five or six hours of work, a change in the specifications requiring seal-welding of all tanks which proved to be much more expensive than the previous method; Acme’s estimate of the added cost, based on the work of a very efficient workman who quit, proved to be too low to meet the cost of the operation in the hands of the workman’s two less efficient successors; excess costs because of the difficulty of securing an adequate supply of skilled labor during the wartime period, despite every effort; excess costs incurred in the procurement of materials in short supply because of the war, high interest required because of Acme’s inability to secure low interest financing from banks or the RFC.

 McGann Mfg. Co. v. United States, 98 F. Supp. 225; Prebilt Co. v. United States, 88 P. Supp. 588.

 Hearings before a Subcommittee of tbe Committee on tbe Judiciary, United States Senate, 79tb Cong., 2d Sess., on S. 1477, April 12 and 13, 1946.

 Cowhig v. National Military Establishment, 109 F. Supp. 519; American Construction Company v. United States, 123 C. Cls. 408, cert. den. 345 U. S. 922 (April 6, 1953).

 Section 1 of the Dent Act authorized the Secretary of War to adjust, pay, or discharge upon an equitable basis any agreement “express or implied” that had been entered into in good faith during the “present emergency” by any officer or agent of the Government acting within the scope of his authority, where such agreement had not been executed in the manner prescribed by law. Section 2 gave jurisdiction to the Court of Claims on the petition of “any individual, firm, company or corporation” to find and award fair and just compensation in the event the individual, etc., was dissatisfied with the settlement made by the Secretary of War.

 35 Stat. 411, 31 U. S. C., Sec. 203.

 See McGann Mfg. Co. v. United States, et al., 87 F. Supp. 983.