## SUMMERFIELD HOUSING LIMITED PARTNERSHIP, Plaintiff,

v.

## The UNITED STATES, Defendant.

No. 97–423C.

United States Court of Federal Claims.

Oct. 29, 1998.

---

Jonathan D. Schwartz, Jr., El Paso, TX, attorney of record for plaintiff.

Russell A. Shultis, Department of Justice, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Kirk T. Manhardt, Assistant Director; and Kenneth M. Racette, Naval Facilities Engineering Command and Charlie W. Priest, Jr., Defense Finance and Accounting Service, of counsel.

## OPINION

FUTEY, Judge.

This contract case is before the court on plaintiff's motion for summary judgment and defendant's cross-motion for summary judg-ment. Plaintiff claims that, according to the terms of a lease agreement with defendant, defendant is obligated to pay an annual Solid Waste Service Charge (SWSC) assessed by the Department of Environmental Resources (DER) of Prince George's County, Maryland (the County). Plaintiff seeks the amount it has paid for the SWSC to the County to date, as well as a declaratory judgment stating that defendant is obligated to pay the SWSC over the remaining years of the lease. Plaintiff also maintains that defendant owes additional interest for late rental payments. Defendant alleges the SWSC is a special assessment tax, and therefore, plaintiff is obligated to pay it under the lease. Defendant further maintains that plaintiff is not entitled to the additional interest it seeks.

### Factual Background

On March 29, 1991, the Department of the Navy (defendant) issued a request for proposals (RFP) no. N6247791RP00017 for the design, construction and lease of: (1) 1,242 new housing units; (2) an 8,650 square foot community center; (3) a thirty-four acre park; (4) an 8,000 square foot management/maintenance facility; and (5) three 450 square foot meeting rooms on a site in the Landover area of Prince George's County, Maryland (the Facility). The RFP contained a form of lease agreement to be executed for a period of twenty years commencing upon the date of issuance of a Certificate of Acceptance from the contracting officer (CO).

The contract was awarded to Hunt Building Corporation (Hunt) on September 26, 1991. Construction began after the lease was entered into. On August 25, 1993, defendant executed an Estoppel Certificate and Consent, in which defendant agreed to make all rent payments under the lease directly to Texas Commerce Bank–El Paso, N.A. (Texas Commerce Bank), as plaintiff's trustee, after issuance of the Certificate of Acceptance. At approximately the same time, Texas Commerce Bank executed a Notice of Assignment of Rents (Notice of Assignment) under the lease, directing the CO to remit rental payments to Texas Commerce Bank when payment commenced upon the issuance of the

Certificate of Acceptance.[1] On August 25, 1993, the CO acknowledged receipt of the Notice of Assignment and a copy of the instrument of assignment executed by Hunt. Further, on December 1, 1995, Hunt assigned its right, title and interest in the Facility to plaintiff.[2] On that same day defendant issued a Certificate of Acceptance, establishing the commencement of the twenty-year lease term.

Pursuant to the lease, defendant is required to pay plaintiff rental payments in monthly arrears, with payment due on the first workday of the month.[3] The lease also provides that rent consists of the fixed rent as well as increases in the required insurance and property taxes.[4] The lease further provides in pertinent part:

> Rent reflects the cost of ownership to the Lessor for the newly-constructed facilities provided to the Government over the term of the lease including, but not limited to, the cost of land, improvements, property taxes, utility connection fees, insurance, the cost of borrowing money, and profits earned thereon. Rent shall be fixed for the lease term with the exception of general real estate tax and insurance increases after the second full year following issuance of the Certificate of Acceptance for the entire Premises by the Government.[5]

In addition, the lease provides that in the event that a rent payment is late, defendant automatically must pay interest on the amount outstanding.[6]

## A. Solid Waste Service Charge

Pursuant to the lease, defendant agreed to contract with a private waste hauler for the removal of refuse from the Facility. On October 27, 1995, defendant modified an existing contract with Priority One Services, Inc. (Priority One), a private solid waste hauler, to include the collection, removal and disposition of refuse from the Facility. After contracting with Priority One, defendant inquired with the DER about the County's refuse collection service. In a letter dated September 3, 1997, from Maclane Gibson of the DER to the CO, Mr. Gibson stated that the County only provided collection services to privately owned single family homes, and also would not be able to provide refuse dumpsters for defendant to use. He stated, however, that the County could collect bulky trash and recyclable garbage from the residents at the Facility.

By letter on May 17, 1996, Samuel Wynkoop, Jr., Director of the County DER, informed plaintiff of the new SWSC that the County instituted on July 1, 1995. Prior to July 1, 1995, only tipping fees were charged to users of the County's two landfills. The letter states in part:

> In 1994, a Supreme Court Ruling [*C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)], invalidated a County law requiring waste haulers to dispose of solid waste collected in Prince George's County at County-owned waste acceptance facilities. The result of this decision was an immediate decline in tonnage delivered to County landfills and a subsequent reduction in revenue.

> Because the County can no longer fund the costs associated with its solid waste programs solely from tipping fee revenues, several service charges have been implemented to help fund the system. These charges, which appear as the "Solid Waste Service Charge" (SWSC) on the County tax bills, provide a more stable revenue

---

1. *See* Plaintiff's Motion for Summary Judgment (Pl's.Mot.) Exhibit (Ex.) E. It is unclear exactly when Texas Commerce Bank executed the Notice of Assignment. The only date contained in that document is the date Hunt executed the instrument of assignment. The date is handwritten and appears to read August 27, 1993. The CO, however, acknowledged receiving the Notice of Assignment and a copy of the instrument of assignment from Texas Commerce Bank on August 25, 1993.

2. Hunt is the managing general partner of plaintiff.

3. Pl.'s Mot., Ex. A, at 45.

4. *Id.* at 3.

5. *Id.* at 3–4.

6. The parties agree the applicable interest rate is 7%, as published in the Federal Register. 61 Fed.Reg. 37794 (1996).

source and decrease the fluctuations in revenues available for solid waste programs. These charges will be assessed to all single family and multifamily dwellings in the County.[7]

On July 15, 1996, plaintiff received a tax bill from the County, for the tax year July 1, 1996 through June 30, 1997, which included the new SWSC. Pursuant to the implementation of the SWSC, the DER assessed three separate charges against plaintiff for the Facility: (1) a base benefit charge amounting to $50.00 per unit for all single family homes and apartments; (2) a bulky trash charge amounting to $18.00 per unit for all single family homes and apartments; and (3) a recycling charge amounting to $50.00 per unit for single family homes and apartments.[8]

Based upon this criteria, the SWSC assessed against plaintiff amounted to $114,-732.00 per year. On September 13, 1996, Ronald Pyke (Controller of Hunt), on behalf of plaintiff, sent the CO a letter that included both a copy of plaintiff's tax bill from the County and a letter from Mr. Wynkoop. Specifically, Mr. Pyke stated that plaintiff believed the SWSC was an operating expense under the lease, and therefore defendant's obligation to pay. Additionally, Mr. Pyke stated that plaintiff would advance the funds to pay the amount due, but that plaintiff wanted to be reimbursed by defendant. Plaintiff paid $114,732 to the County for the SWSC on September 23, 1996 for the July 1996 to June 1997 tax year. By letter dated January 9, 1997, the CO denied Mr. Pyke's request. On February 4, 1997, plaintiff filed a claim with the CO seeking reimbursement for the SWSC and asking for a final decision on the matter. On April 3, 1997, the CO denied plaintiff's claim. Specifically, the CO determined the SWSC imposed by the County was a special assessment tax as defined under Maryland law, and therefore, it was plaintiff's obligation to pay under the lease. Plaintiff paid $114,732 to the County for the

SWSC for the July 1997 to June 1998 tax year on or about September 30, 1997.

B.   Rental Payments

On December 19, 1995, approximately two weeks after defendant issued the Certificate of Acceptance, plaintiff sent the CO a letter authorizing and directing defendant to make all rental payments and other sums due under the terms of the lease directly to Texas Commerce Bank, as trustee for plaintiff.[9] On April 18, 1996, the CO modified the lease, identifying Texas Commerce Bank as the assignee of plaintiff's lease payments, and further identifying the Defense Finance and Accounting Service (DFAS) as the disbursing office. Significantly, the modification incorporated the Notice of Assignment previously executed by Texas Commerce Bank in August, 1993. The CO sent this modification to DFAS on the same day. According to the record, however, DFAS did not receive a copy of the modification until May 20, 1996. Plaintiff received its copy of the modification on April 29, 1996.

Defendant continued to make rent payments to Hunt up to and including May 1996. Defendant asserts that sometime in April or May of 1996, DFAS learned of the purported assignment, at which time it requested copies of the Notice of Assignment and instrument of assignment from Texas Commerce Bank. DFAS then withheld payments until it received proper notice of the assignment, which, according to defendant, occurred on July 24, 1996, the date that DFAS received the Notice of Assignment and a copy of the instrument of assignment directly from Texas Commerce Bank.

On September 10, 1996, defendant disbursed the rental payments for the months of June and July 1996, and included an interest payment of $6,899.98 for the late payment of rent.[10] With regard to the late rental payments, defendant believed that pursuant to the lease, interest did not begin to accrue until thirty days after July 24, 1996, the date

7.   Pl.'s Mot., Ex. K, at 1.

8.   *Id.* at 3–8; *see also id.*, Ex. L.

9.   It appears plaintiff sent this letter as a reminder to remit payments to Texas Commerce Bank,

as previously delineated in the Notice of Assignment, executed in August, 1993.

10.   The payment covered two invoices, each constituting $3,449.99.

it received the Notice of Assignment and instrument of assignment from Texas Commerce Bank. Plaintiff, however, asserts the June lease payment was due on July 1, 1996, and the July lease payment was due on August 1, 1996, thereby entitling it to an additional $14,354.17 in interest. By a letter dated March 25, 1997, plaintiff sought a final decision from the CO upon its demand for the additional interest for the months of June and July 1996. The CO issued a final decision on April 28, 1997, stating that the responsibility for remittance of monthly rental payments rested with DFAS, and that he had no authority to determine whether DFAS owed additional interest.

On June 13, 1997, plaintiff filed a complaint in this court, seeking reimbursement for the SWSC it has paid to date, a declaratory judgment that defendant is responsible for the SWSC over the remaining term of the lease, and additional interest on the alleged late rental payments. Plaintiff filed its motion for summary judgment on March 4, 1998, asserting the SWSC is a charge for the use and occupancy of the premises, and not a special assessment tax, and therefore, is defendant's obligation to pay. Plaintiff also claims defendant owes $14,354.17 in additional interest. On April 30, 1998, defendant filed its cross-motion for summary judgment, claiming the SWSC is a special assessment tax, and thus, plaintiff's obligation to pay. Defendant also avers that a proper notice of the assignment of lease payments from plaintiff to Texas Commerce Bank did not occur until DFAS received notice of the assignment as required by the Assignment of Claims Act, 31 U.S.C. § 3727 (1994), and the Assignment of Contracts Act, 41 U.S.C. § 15 (1994). According to defendant, this did not occur until July 24, 1996. Thus, defendant asserts it paid the correct amount of interest. On September 14, 1998, the court heard oral argument on the parties' motions.

## Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed.Cir. 1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir.1987). Alternatively, if the moving party can show that there is an absence of evidence to support the nonmoving party's case, then the burden shifts to the nonmoving party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

The court must resolve any doubts about factual issues in favor of the nonmoving party, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all the inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir. 1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir. 1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692–93 (4th Cir.1969), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc., v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must

evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman,* 26 Cl.Ct. at 1014).

This court has jurisdiction over plaintiff's complaint pursuant to the Contract Disputes Act, 41 U.S.C. § 609(a) (1994). The parties present this court with two issues for decision: (1) which party is obligated under the lease to pay the SWSC; and (2) whether defendant's rent payments for June and July 1996 were late under the terms of the lease.

## I. *Solid Waste Service Charge*

▪ The first issue presents the court with questions of contract interpretation. The court may rule on such interpretations as a matter of law. *National Rural Utilities Coop. Finance Corp. v. United States,* 14 Cl.Ct. 130, 136 (1988), *aff'd,* 867 F.2d 1393 (Fed.Cir.1989). Contract interpretation ordinarily begins with the plain meaning of the provision in question. *S.W. Aircraft Inc. v. United States,* 213 Ct.Cl. 206, 551 F.2d 1208, 1212 (Ct.Cl.1977). The court must construe the contract by its plain and unambiguous language. *National Rural,* 14 Cl.Ct. at 136. "The language of a contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 975 (1965). "Generally, the plain language of a contract controls, and only language which is reasonably susceptible to more than one meaning may be considered ambiguous." *Thermal Electronic, Inc. v. United States,* 25 Cl.Ct. 671, 673 (1992) *citing Neal & Co. v. United States,* 19 Cl.Ct. 463, 471 & n. 4 (1990), *aff'd,* 945 F.2d 385 (Fed.Cir.1991); *John C. Grimberg Co. v. United States,* 7 Cl.Ct. 452, 457 (1985), *aff'd,* 785 F.2d 325 (Fed.Cir.1985). An ambiguity does not exist simply on the basis that the parties assert different interpretations of the contract. *Thermal,* 25 Cl.Ct. at 673.

▪ In interpreting a contract, the court seeks to "effectuate its spirit and pur-

pose." *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (Ct.Cl.1978)). A court must give reasonable meaning to all parts of the contract "so as to harmonize and give meaning to all its provisions," and not render portions of the contract meaningless. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979); *see also Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985). Furthermore, "an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona,* 575 F.2d at 863.

In the case at bar, there is disagreement as to which party is responsible for the SWSC. Plaintiff contends that the SWSC is a maintenance cost, and therefore, it is defendant's obligation to pay under the lease. Plaintiff further contends that the lease, together with the RFP, which the lease incorporates by reference, demonstrates the parties' intent for defendant to pay the SWSC. Conversely, defendant maintains the SWSC is a special assessment tax, and therefore, it is plaintiff's obligation to pay.

The first page of the RFP, which summarizes the project, states "the maximum annual rental does not include utility consumption and property maintenance costs, which will be paid by the government." [11] The RFP further states: "[f]ollowing issuance of the Certificate of Acceptance for the entire premises by the government, selection of a private waste collection firm for [waste collection] services (including rental of dumpsters) will be contracted by the government under the maintenance contract for this project." [12] In addition, the lease provides:

> The Government intends to use the leased premises for residential occupancy by Government personnel. At its sole cost and expense, the Government shall provide for the operation of the Premises and perform all maintenance, repairs, replace-

---

**11.** Request for Proposal (RFP), filed Sept. 22, 1998, at i.

**12.** *Id.* at E–22.

ment, rehabilitation, and redecoration as the Government in its discretion determines necessary (with the exception of Lessor provided landscape "maintenance as described on page E–17, paragraph (8) Landscaping (as amended), of the RFP, warranty items and" portions of utilities normally maintained by utility providers).[13]

Although neither party disputes that the expense of removing trash itself is a cost of maintenance, they dispute whether the SWSC was intended as a cost of maintenance. Plaintiff contends the SWSC is included in the cost associated with solid waste collection and removal from the facility. At oral argument, plaintiff stated:

> [T]he bargain between the parties as envisioned by the RFP on which our proposal is based and the lease agreement which codifies the terms of the agreement between the two parties, is founded on the premise that the developer will not have to contend with solid waste disposal.... [14]

In addition, plaintiff asserts that if no SWSC was in place, defendant would be responsible for paying these fees under the maintenance provision of the lease. Although defendant concedes this point, it disputes that the SWSC is included as a maintenance cost. With regard to its position, defendant stated at oral argument: "the contractual role of the Government with respect to utility services is that of a consumer, not a property developer," [15] and the SWSC is assessed against the property owner. Further, defendant stated that as a consumer, it was already paying for the waste disposal for which it contracted.

It is clear from the language of the lease and the RFP that the parties intended defendant to pay for the removal of solid waste from the Facility. Additionally, at the time the parties entered the lease, tipping fees were used as the sole means by which the County charged for the use of its landfills and for funding its solid waste programs.

Moreover, the parties agree it was their intention for defendant to pay these tipping fees. Plaintiff asserts, however, that the SWSC is still a tipping fee, regardless of the name used, and therefore, is still defendant's responsibility to pay.

The record demonstrates that tipping fees are still used by the County. First, in a letter dated May 17, 1996, from the Director of the County DER to plaintiff, Mr. Wynkoop stated "[b]ecause the County can no longer fund the costs associated with its solid waste programs *solely* from tipping fee revenues, several service charges have been implemented to *help fund* the system." [16] Second, in a letter dated January 9, 1997, the CO informed Mr. Pyke "the [SWSCs] *are not a replacement* for County landfill tipping fees. The tipping fees are paid by the contracted trash collector." [17] Finally, in letter to Mr. Wynkoop, dated February 4, 1997, Mr. Pyke asserted "by shifting these fees to homeowners, the County is able to charge lower tipping fees ..." [18]

Because tipping fees continue to be used by the County, defendant would still be responsible for their payment as a cost of maintenance. It is possible, however, that Priority One might dispose of the Facility's refuse in another county. Yet irrespective of where Priority One disposes of the Facility's refuse, the County would still assess the SWSC against plaintiff. It is therefore axiomatic that the SWSC can not be a tipping fee for which defendant is responsible.

The parties next dispute whether the SWSC is a tax. The lease specifically allocates the payment of certain taxes to each of the parties. Article III of the lease, entitled "Tax Increases," provides that "[a]fter completion of the second full year following the date of issuance of the Certificate of Acceptance for the entire Premises, the Government shall pay all general real estate tax

---

13. Pl.'s Mot., Ex. A, at 19.

14. Oral Argument Transcript (Tr.) at 13.

15. *Id.* at 33.

16. Pl.'s Mot., Ex. K, at 1. (emphasis added).

17. *Id.,* Ex. W (emphasis added).

18. *Id.,* Ex. X.

increases."[19] The lease defines "general real estate taxes" as:

> taxes which are assigned on an *ad valorem* basis, without regard to benefit to the property, for the real purpose of funding general governmental services. The term ... shall exclude any fines, interest or penalty for nonpayment, but shall include any discount offered for prompt payment whether the Lessor has taken advantage of it or not.[20]

The lease further provides "the Lessor shall be responsible to pay all taxes, general or special, all public rates, dues and *special assessments* of every kind which may become due and payable or which are to be assessed against or levied upon said premises during the term of the lease."[21]

The lease, however, does not define the term "special assessment." In light of this omission, both parties have focused on Maryland law for clarification. Generally, extrinsic evidence may not be used unless an ambiguity is identified in the contract language. *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994). A court, however, may use extrinsic evidence for the limited purpose of shedding light on the parties' objective intent by clarifying the meaning of terms found within the four corners of the contract. *See Applied Companies v. United States*, 37 Fed.Cl. 749, 759 (1997). It is clear that the parties intended that state law would affect the lease:

> [T]he Lessor will at all times during the existence of this lease comply, at its sole cost and expense, with the provisions of any and all federal, state and local statutes, ordinances, rules, and regulations which may be applicable to the Lessor.[22]

Additionally, a special assessment tax passed by the state of Maryland, or any County, is a law to which plaintiff would be subject. The above contractual provision, when read to-gether with Article III of the lease, which pertains to tax increases, clearly evidences the parties' anticipation that state and county taxes would arise and affect the contractual obligations of the parties. Thus, it is reasonable to conclude that the parties intended the use of state law to aid in the construction of the lease. Accordingly, such extrinsic evidence will aid in the clarification of the term "special assessment."

Under Maryland law, a special assessment tax is a "tax levied occasionally as may be required upon a limited class of persons interested in local improvement, and who are presumed to be benefitted by the improvement over and above the ordinary benefit which the community in general derive from the expenditure of money." *Williams v. Anne Arundel County*, 334 Md. 109, 638 A.2d 74, 78 (1994) (quoting *Gould v. City of Baltimore*, 59 Md. 378, 380 (1883)). "In order to justify a special assessment for local improvement, however, there must be both a public purpose and a special benefit to the property assessed over and above that accruing to the public." *Montgomery County v. Schultze*, 302 Md. 481, 489 A.2d 16, 19 (1985). "Special assessments are thus imposed because the improvements for which the assessment is levied cause an enhancement of the property value with no pecuniary loss suffered by the property owner." *Id.*, 489 A.2d at 20 citing *Pumphrey v. County Comm'rs of Anne Arundel County*, 212 Md. 536, 130 A.2d 297 (1957).

Plaintiff alleges the SWSC can not be a special assessment because it is not assessed on an *ad valorem* basis. Plaintiff supports its argument with an opinion letter from the Office of the Attorney General of the State of Maryland, wherein Richard Israel, Assistant Attorney General, determined the SWSC is a flat charge and not a property tax.[23] Plaintiff further supports its argu-

---

**19.** *Id.*, Ex. A, at 4.

**20.** *Id.*, Ex. A, at 4. Black's law dictionary defines "ad valorem tax" as "a tax imposed upon the value of or property." Blacks Law Dictionary 51 (6th Ed.1990).

**21.** Pl.'s Mot., Ex. A, at 20. (emphasis added).

**22.** *Id.* at 32.

**23.** In that letter, Mr. Israel examined whether the SWSC fell within a property tax exemption accorded to disabled veterans and their spouses. In determining that the SWSC was not a property tax, he concluded that the SWSC did not fall within the property tax exemption. He did not determine, however, that the SWSC was not a special assessment tax. Pl.'s Mot., Ex. X.

ment with the affidavit of Leslie Romine, local counsel for plaintiff, in which she attests "the solid waste charge is not an *ad valorem* tax, which is the required method for assessing a valid solid waste service charge."[24] Thus, plaintiff concludes that because the SWSC is neither a property tax nor an *ad valorem* tax, it must be a charge for the occupancy of the premises.[25]

Chapter 802 of the Laws of Maryland of 1965 provides:

Special assessment taxes levied by the board for the costs of garbage and trash collection, removal and disposition, including site acquisition and operation shall be by an ad valorem tax against all of the properties assessed for county tax purposes within the area receiving trash and garbage removal and disposition service. The Board may in its discretion prescribe the method of payment and the rate of tax for the costs of the collection, disposition, removal and disposition of the trash and garbage as follows: the basis of said tax to be the total costs of said service divided by the number of units served....

1965 Md. Laws Ch. 802(c)(2).

This authority to levy the special assessment was delegated to the County, as the identical provision is found in that County's Code. The Code provides in relevant part:

(b) The special assessment taxes levied by the Council for the costs of garbage and trash collection, removal and disposition, including site acquisition and operation shall be by an ad valorem tax against all of the properties assessed for County tax purposes within the area receiving trash and garbage removal and disposition service. The Council may in its discretion prescribe the method of payment and the rate of tax for the costs of the collection, removal and disposition of the trash and garbage as follows: the basis of said tax to be the total costs of said service divided by

the number of units served. The Council may vary the tax rate as between individual residential units and commercial establishments. Such decision as to any variance for such service by the Council shall be conclusive.

Prince George's County, Md., Code § 2–375(b) (Supp.1996).

In addition, the statute further provides:

(1) the special assessment tax rate for garbage and trash disposition and the acquisition and operation of a site or sites for the disposition of such garbage and trash shall be established on a *per unit basis.*

(2) the special assessment tax rate for garbage and trash disposition and the acquisition and operation of a site or sites for the disposition of such garbage and trash for residential and commercial uses shall be based on the amount of garbage and trash anticipated to be generated by each type of use. The County Executive shall collect appropriate data, analyze waste generation, and recommend a reasonable system of rates and charges for adoption by the Council in conjunction with the adoption of the annual operating budget.

Section 2–375(b)(1) & (2) (emphasis added).

It is clear that these statutory provisions require that a special assessment tax be used as a levy for the collection, removal and disposition of trash. Plaintiff's contention that a special assessment tax *must* be levied on an *ad valorem* basis is misplaced. To the contrary, the cited text of the statutes permits special assessments to be levied on a per unit basis. Indeed, the SWSC at issue was levied on such a basis. Thus, the court finds that the SWSC is a special assessment tax. Accordingly, the plain language of the lease places the obligation to pay special assessment taxes on plaintiff.

Plaintiff, however, alleges that the SWSC can not be a special assessment tax because

---

**24.** *Id.,* Affidavit (Aff.) of Leslie Romine, at 2, ¶ 12.

**25.** Plaintiff also alleges that the SWSC is a cost of operating the premises. In support of this argument plaintiff submits the affidavit of Thomas Houff, Supervisor of Assessment in Prince George's County Office of State Department of Assessments and Taxation, in which Mr. Houff

states his office permits the SWSC to be included as an operating expense for income producing properties. *Id.,* Aff. of Thomas Houff, at 2, ¶ 7. This argument is inapposite. Even if Mr. Houff's statement is true, it still ignores the fact that the County determined that levies on solid waste disposal would be by a special assessment tax.

it would be impossible to show the Facility derives any special benefit from the County landfills. Plaintiff further asserts that if any entity receives a special benefit, it is the tenants and not the property itself, that actually receives the benefit.

In *Pumphrey v. County Comm'rs of Anne Arundel County*, 212 Md. 536, 130 A.2d 297 (1957), Anne Arundel County established garbage zones and assessed service charges against each household and commercial unit in those zones for the removal of garbage, ashes, trash and other waste materials. The charges were levied to defray the cost of removing these waste materials. *Id.*, 130 A.2d at 298. The plaintiff, a landlord, asserted there was no basis for charging him, rather than his tenants, because the tenants received the special benefit. *Id.* The plaintiff also asserted he received no special benefit because his units were all rented at the time the service charge was implemented. *Id.* at 299. The Maryland Court of Appeals, however, held "it could hardly be argued that the value and chances for rental of the residential properties are not increased by a public disposal system." *Id.* at 300.[26]

The court notes that the determination of whether to impose a special assessment is left to the County legislature. *See Mayor and Council of Rockville v. Woodmont Country Club*, 348 Md. 572, 705 A.2d 301, 306 (Md.1998) ("The determination of whether to impose a special assessment and the mode of imposing a special assessment are legislative determinations"). Moreover, there is a presumption that local improvements specifically benefit the properties that have been assessed. *V.F.W. v. Montgomery County*, 207 Md. 442, 115 A.2d 249, 254 (1955); *see also Sulzer v. Montgomery County*, 60 Md.App. 637, 484 A.2d 285, 291 (1984) (presumption that the legislative determination is correct). Thus, it is clear that the determination of

whether the Facility receives a special benefit is within the discretion of the County legislature. Additionally, *Pumphrey* casts no doubt that a public landfill may provide a special benefit upon properties assessed.

Alternatively, plaintiff asserts that if the court finds the SWSC is a special assessment tax, this issue falls within the exceptions discussed in *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562 (Fed.Cir.1987) and *Wright Runstad Properties Ltd. Partnership v. United States*, 40 Fed.Cl. 820 (1998). In effect, plaintiff contends that the SWSC is the same charge as the tipping fees, but only in a different form with a different name.

*Alvin* involved lease agreements between thirty limited partnerships (plaintiffs) and the Postal Service, which required the plaintiffs to pay for special assessment taxes and the Postal Service to pay general real estate taxes. *Alvin*, 816 F.2d at 1563. After the lease periods began, a change in the California Constitution mandated that *ad valorem* taxes on property could not exceed one percent of the property's assessed value, thus requiring numerous communities to invoke alternative methods of revenue collection. *Id.* at 1563. The United States Court of Appeals for the Federal Circuit noted that the Postal Service normally would not be responsible for the payment of the special assessments. *Id.* at 1565. The court recognized, however, that the Postal Service Board of Contract Appeals found the new special assessments levied against the plaintiffs' properties succeeded the levies that the parties intended would be borne by the Postal Service. *Id.* Hence, the court held that "the Postal Service's undertaking to pay general real estate taxes requires the payment of those levies that succeeded the general real estate taxes, however these successor taxes

**26.** Plaintiff seeks to distinguish *Pumphrey* by asserting that there was no evidence that such a charge existed before the special assessment was instituted, and therefore, the court had to find there was a special benefit. This is immaterial. Whenever a legislature passes a special assessment, by definition that special assessment must confer a special benefit upon the property assessed. *See Montgomery County v. Schultze*, 489 A.2d at 20. Additionally, Maryland courts pre-

sume the property received a special benefit. *V.F.W. v. Montgomery County*, 207 Md. 442, 115 A.2d 249, 252 (1955). Plaintiff also seeks to distinguish *Pumphrey* by arguing that in the case at bar all the units are rented for twenty years, and thus no benefit inures to the Facility. The court in *Pumphrey*, however, concluded the landlord's property received a special benefit despite the fact that all of the landlord's units were currently rented out to tenants. *Id.* at 300.

are denominated." *Id.* at 1566. According to the Federal Circuit, "such payment reinstates the original bargain, as it was understood by both the Postal Service and the lessors." *Id.*

*Wright Runstad Ltd. Partnership* similarly involved a dispute regarding the payment of a special assessment tax, the purpose of which was to fund a tunnel in Seattle, Washington. *Wright,* 40 Fed.Cl. at 822. The court, however, determined that the exception in *Alvin* did not apply because "the special assessment was a one time charge," and "[its] purpose ... was to pay for the tunnel rather than general government services previously funded by ad valorem real estate taxes." *Id.* at 826.

Plaintiff contends the exception discussed in these cases is applicable and thus resolves this issue. At oral argument plaintiff stated:

> Our parallel between [*Alvin* ] and this case is, it was a tipping fee. Once one, it's still one. We don't care what you call it. We don't care what it's labeled. It's clear as a bell that tipping fee was supplanted by the solid waste service charge, and it was supplanted for it and for one purpose only, and that is to fund that service.[27]

In ascertaining whether a change in law may be accommodated, the original intent of the parties must be considered. *Alvin,* 816 F.2d at 1565. As discussed, it is clear from the lease that the parties intended defendant would pay for solid waste removal under the maintenance clause of the lease. Unlike *Alvin,* however, the original tipping fees were not replaced by the SWSC. Rather, plaintiff's own documents demonstrate that the County continues to charge tipping fees. Moreover, these successor taxes have supplemented, not replaced, the tipping fees. Hence, the parties' original intent can be realized, because defendant would be required to pay the same form of fee it did before the SWSC was implemented. To apply the *Alvin* exception would require defendant to pay for a special assessment tax, in this case the SWSC, and the tipping fees. Such a result, however, would not "reinstate the initial bargain of the parties," *Alvin,* 816 F.2d at 1566, but instead would allow plaintiff to receive more than it bargained for. The parties intended plaintiff to pay any special assessment taxes levied, and plaintiff bore that risk under the lease. Accordingly, plaintiff is the appropriate party to pay the SWSC.

## II.  *Late Interest Payments*

Although the parties do not dispute that defendant's June and July 1996 rental payments were late, they dispute: (1) when proper notice of the assignment was given; (2) the actual date the rental payments were due; and (3) the amount of interest owed on those payments. Article XIX of the lease provides:

> The Lessor, under the Assignment of Claims Act, as amended, 31 U.S.C. § 3727, 41 U.S.C. § 15 ... may assign its rights to be paid amounts due or amounts to become due as a result of the performance of this lease to a bank, trust company, or other financing institution, including any Federal lending agency.... [28]

The Assignment of Claims Act, 31 U.S.C. § 3727, provides:

> (a) In this section, "assignment" means—
>
> > (1) the transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or
> >
> > (2) the authorization to receive payment for any part of the claim.
>
> (b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

---

27.  Tr. at 23.

28.  Pl.'s Mot., Ex. A, at 32. The lease refers to both statutes as the "Assignment of Claims Act."

(c) Subsection (b) of this section does not apply to an assignment to a financing institution of money due or to become due under a contract providing for payments totaling at least $1,000 when—

. . . .

(3) the assignee files a written notice of the assignment and a copy of the assignment with the contracting official or the head of the agency, the surety on a bond on the contract, and any disbursing official for the contract.

31 U.S.C. § 3727 (1994).

The Assignment of Contracts Act, 41 U.S.C. § 15, provides:

(a) Transfer

No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States is concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

(b) Assignment

The provisions of subsection (a) of this section shall not apply in any case in which the moneys due or to become due from the United States or from any agency or department thereof, under a contract providing for payments aggregating $1,000 or more, are assigned to a bank, trust company, or other financing institution, including any Federal lending agency, provided:

. . . .

(3) That, in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of the assignment with—

(A) the contracting officer or the head of his department or agency;

(B) the surety or sureties upon the bond or bonds, if any, in connection with such contract; and

(C) the disbursing officer, if any, designated in such contract to make payment.

41 U.S.C. § 15 (1994).

■■■ These statutes operate to invalidate transfers of government contracts or claims against the government. *United California Discount Corp. v. United States,* 19 Cl.Ct. 504, 507 (1990). They were enacted in order to allow the government to deal exclusively with the original claimant, and enable the government to be aware of its obligations. *Patterson v. United States,* 173 Ct. Cl. 819, 354 F.2d 327, 329 (1965). Each statute contains a financial institution exception. This financial institution exception makes it easier for government contractors to secure financing for carrying out obligations to the government to the extent that government contracts might be speedily and effectively performed. *Waxman v. United States,* 125 Ct.Cl. 464, 112 F.Supp. 570, 588 (1953). Courts have held the financial institution exception must be strictly construed. *See American Fin. Assoc., Ltd. v. United States,* 5 Cl.Ct. 761, 768 (1984), *aff'd,* 755 F.2d 912 (Fed.Cir.1985); *accord United California Discount Corp.,* 19 Cl.Ct. at 507; *Trust Co. Bank of Middle Georgia, N.A. v. United States,* 24 Cl.Ct. 710, 711–12 (1992). Thus, a contractor must meet the requirements of these sections in order to gain the benefit of the exception. *United California Discount Corp.,* 19 Cl.Ct. at 507.

Plaintiff alleges its December 19, 1995 letter, which instructed defendant to remit all rental payments and other sums due under the lease directly to the Texas Commerce Bank, constituted proper notice of the assignment. Plaintiff argues that it complied with the Assignment of Contracts Act because no disbursing official was named in the lease prior to the unilateral modification issued on April 18, 1996. Plaintiff contends that defendant acknowledged receipt of the Notice of Assignment to the Texas Commerce Bank. Accordingly, plaintiff asserts the interest payments should be calculated for June from July 2 to September 10, 1996, and for July from August 2 to September 10, 1996.

Defendant avers that the Notice of Assignment was not perfected until July 24, 1996,

the date Texas Commerce Bank provided the appropriate assignment documents to DFAS. Although defendant admits that DFAS was not listed in the lease until the unilateral modification on April 18, 1996, it asserts that plaintiff failed to comply with the Assignment of Claims Act because it was aware that DFAS was the disbursing office that paid Hunt, and therefore knew that DFAS was the disbursing office *to the contract*.[29] Defendant also alleges DFAS properly withheld payment until Texas Commerce Bank, on behalf of plaintiff, perfected the assignment. Defendant further alleges that because plaintiff did not strictly comply with the statute, interest did not begin to accrue until a reasonable time after all documents necessary to perfect the assignment had been received.

Plaintiff's December 19, 1995 letter to the CO did not constitute proper notice of the assignment. Both the Assignment of Claims Act and the Assignment of Contracts Act require the assignee to file written notice of the assignment and a copy of the instrument of assignment with the CO. Texas Commerce Bank, however, provided proper notice of the assignment to the CO, because it submitted both the Notice of Assignment document and the instrument of assignment. As mentioned, the CO acknowledged receipt of these documents on August 25, 1993. Although defendant does not argue that Texas Commerce Bank failed to provide proper notice of the assignment to the CO, it contends that Texas Commerce Bank failed to provide proper notice of the assignment to DFAS.

██ "It is well established ... that the Government can waive the statutory prohibitions against the assignment of contract rights if the contracting officer gives clear assent to the assignment." *D & H Distributing Co. v. United States*, 102 F.3d 542, 546 (Fed.Cir.1996) citing *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 614 F.2d 740, 745–46 (Ct.Cl.1980) (holding that in limited circumstances the government can waive the notice provisions and recognize an assignment even when the contractor does not comply with those provisions). Courts may allow a trans-

fer to stand if the underlying purpose of the statute is not impinged. *United Int'l Investigative Services v. United States*, 26 Cl.Ct. 892, 898 (1992), *rev'd on other grounds*, 109 F.3d 734 (Fed.Cir.1997). For example, the transfer of government contracts should be upheld if the government recognizes it either expressly, as by novation, or implicitly, as by ratification or waiver. *Id.*

██ In *Norwest Bank of Arizona, N.A. v. United States*, 37 Fed.Cl. 605, 606 (1997), the CO modified a contract to name the contractor's bank as payee. The court held that the CO's actions demonstrated an express agreement to pay the bank, and thus waived any defects with the technical requirements of the Assignment of Claims Act and the Assignment of Contracts Act. *Id.* at 610; *see also D & H Distributing*, 102 F.3d at 547 (holding that the CO assented to the transfer of rights under the contract by modifying the contract to include a joint payment agreement).

Just as in *Norwest Bank of Arizona*, the CO in this case also modified the contract, directing DFAS to make rental payments to Texas Commerce Bank. Additionally, that modification incorporated the Notice of Assignment document signed by Texas Commerce Bank. "A complete ... assignment of the right to be paid the proceeds of the contract imposes an obligation on the promisor, once it has received notice of the assignment, to make payments under the contract in accordance with that assignment." *D & H Distributing*, 102 F.3d at 547. Thus, by modifying the contract to name Texas Commerce Bank as assignee and to incorporate the Notice of Assignment document, the "government expressly agreed to the assignment directing payments to the bank," *Norwest Bank of Arizona*, 37 Fed.Cl. at 610, thereby waiving any defects with the requirements of the Assignment of Claims Act and Assignment of Contracts Act.

The lease provides that "[r]ent ... shall be paid monthly in arrears and will be due on the first workday of each month, and only as

---

**29.** While the parties' dispute centers on the different language of each statute, the differing language does not affect the outcome under the facts of this case.

provided for by this lease." [30] Additionally, in the event that a rent payment is late, defendant automatically must pay interest on the amount outstanding. The court finds that the June 1996 rental payment was due on July 1, 1996, and the July 1996 renal payment was due on August 1, 1996. Therefore, defendant is liable for interest for the additional days that the rental payments were late.[31]

### Conclusion

For the above stated reasons, the court concludes the SWSC is a special assessment tax, and therefore, plaintiff is responsible for its payment. In addition, by modifying the contract to designate Texas Commerce Bank as the payee, defendant expressly agreed to the assignment and waived any defects with the Assignment of Claims Act and Assignment of Contracts Act. Accordingly, the court grants defendant's motion for summary judgment on the issue of the SWSC, and denies plaintiff's cross-motion. In addition, the court grants plaintiff's motion for summary judgment on the issue of additional interest in the amount of $14,354.17, and denies defendant's cross-motion. The Clerk is directed to enter judgment pursuant to this opinion. No costs.

IT IS SO ORDERED.

---

30. Pl.'s Mot., Ex. A, at 45.

31. Plaintiff claims $14,354.17 in additional interest, and defendant has not challenged this amount.